608 P.2d 861

Richard Fermin GAVICA, personally and as heir, and as administrator of the estates of Fermin Gavica and Jean Gavica, deceased; Delphine Rae Schubert, personally and as heir; and Geraldine Jo Krueger, personally and as heir, Plaintiffs-Appellants,

v.

Harold Edmund HANSON; Stephen F. Frost d/b/a Stephen F. Frost Trucking Company, J. R. Simplot Company, a Nevada Corporation; FMC Corporation, a Delaware Corporation; The State of Idaho; and Tiger Transportation, Inc., a Foreign Corporation, Defendants-Respondents.

No. 12921.

Supreme Court of Idaho.

March 6, 1980.

Rehearing Denied April 21, 1980.

Herman J. McDevitt, M. Jay Meyers and Boyd B. White, II, of McDevitt, McDevitt, Meyers & White, Pocatello, for plaintiffs-appellants.

Wesley F. Merrill, of Merrill & Merrill, Gary L. Cooper, of Racine, Huntley & Olson, Martin R. Ward, of Maguire, Kisling & Ward, Pocatello, Richard C. Fields and Donald J. Farley, of Moffatt, Thomas, Barrett & Blanton and Craig Meadows, of Hawley, Troxell, Ennis & Howley, Boise, for defendants-respondents.

SHEPARD, Justice.

This is an appeal from two summary judgments granted in favor of defendants-respondents. Plaintiffs-appellants brought this action for the wrongful death of their parents, who were killed in an automobile accident. In that action plaintiffs-appellants sought punitive damages against certain of the defendants-respondents, and prior to trial summary judgment issued against plaintiffs-appellants prohibiting any consideration of punitive damages. Summary judgment was also granted in favor of the defendant-respondent State of Idaho on the basis that as a matter of law there had been no breach of duty by the State and in any event the asserted negligence of the State was not the proximate cause of the accident. We reverse both summary judgments.

On December 20, 1974, Fermin and Jean Gavica were traveling in their automobile easterly on Highway I–15W. Defendant-respondent Hanson, driving a truck, was also traveling eastward on the same highway some distance behind the Gavicas. On that particular stretch of the highway lay a thick haze which appears to have been caused by certain atmospheric conditions in combination with emissions from the nearby industrial plants of defendants-respondents J. R. Simplot Company and FMC Corporation. Drivers proceeding along the highway should observe the haze approximately two miles prior to entering it.

The Gavicas entered the haze and the driver of another car indicated that thereafter the Gavicas were "going slow or stopped." Hanson indicated that upon entering the haze he reduced his speed from 55 miles per hour to 35 miles per hour. That assertion, however, is questioned since an examination of the truck immediately after the accident revealed that the gear lever was in fourth auxiliary. Hanson denied such, stating that to be in that gear "you'd have to hit at least 70 [MPH]." Hanson testified that the haze cleared slightly and he suddenly came upon the Gavica vehicle which he estimated to be moving at about 5 MPH. The truck struck the Gavica vehicle from the rear and both Gavicas were killed instantly.

Reduced visibility and haze in this particular area has been a continuing but infre-

quent problem since at least 1965. Prior to the construction of Highway I–15W, FMC, Simplot and the State of Idaho worked together to set up signs along U.S. Highway 30 warning of the haze condition. Those signs still exist today.

Highway I–15W, completed in the late 1960's, is located approximately 150 yards to the north of U.S. Highway 30 and runs roughly parallel to it. In 1971 the State, after receiving complaints about poor visibility, experimented with temporary warning signs along Highway I–15W. That experiment, however, lasted only three months and was declared impractical. It was not until after the Gavicas' death that the State erected permanent warning signs along Highway I–15W to warn motorists of the danger of haze.

Plaintiffs-appellants brought this wrongful death action seeking compensatory and punitive damages from J. R. Simplot Company, FMC Corporation, Harold Hanson, and Hanson's employer, Stephen F. Frost Trucking Company. Plaintiffs-appellants sought compensatory damages from the State of Idaho. Defendants moved for summary judgment forbidding proof and allowance of punitive damages on the basis that such damages were not permissible in a wrongful death action. That summary judgment was granted. The court also granted summary judgment in favor of the State of Idaho on the basis that the State's failure to place warning signs on Highway I–15W was neither the proximate cause of the collision nor the breach of a duty of the State. Plaintiffs-appellants sought and obtained a certification that the issues decided by summary judgment presented controlling matters of law necessary of decision prior to trial and this Court permitted this appeal by certification. I.A.R. 12.

I

Whether punitive damages should be allowed in wrongful death actions is a case of first impression in Idaho. Our statute, I.C. § 5–311, provides:

"*Action for wrongful death.*—When the death of a person, not being a person provided for in section 5–310, Idaho Code, is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death; or if such person be employed by another person who is responsible for his conduct, then also against such other person. In every action under this and the preceding section, such damages may be given as under all the circumstances of the case may be just."

The precise issue then to be decided is whether the statutory language "such damages may be given as under all the circumstances of the case may be just" permits proof and allowance of punitive damages. Principles of statutory interpretation require this Court to ascertain and give effect to the legislative intent. *Summers v. Dooley,* 94 Idaho 87, 481 P.2d 318 (1971); *Jorstad v. City of Lewiston,* 93 Idaho 122, 456 P.2d 766 (1969). "The intent of the legislature may be implied from the language used, or inferred on grounds of policy or reasonableness." *Summers v. Dooley, supra* at 89, 481 P.2d at 320. In effectuating the legislative intent behind an ambiguous statute, the Court should, if possible, avoid indulging in a statutory construction which would cause absurd or unduly harsh results. *Lawless v. Davis,* 98 Idaho 175, 560 P.2d 497 (1977); *Hartman v. Meier,* 39 Idaho 261, 227 P. 25 (1924). By providing for wrongful death actions, I.C. § 5–311 is in derogation of the common law rule forbidding such actions. *Hughes v. Hudelson,* 67 Idaho 10, 169 P.2d 712 (1946). I.C. § 73–102 requires that statutes in derogation of the common law "be liberally construed, with a view to effect their objects and to promote justice."

We therefore examine the provisions of I.C. § 5–311 having regard to policies underlying punitive damage awards. The language of I.C. § 5–311 is broad. As stated in *Hepp v. Ader,* 64 Idaho 240, 130 P.2d 859 (1942),

"Our statute . . . providing for recovery of damages for death, caused by wrongful act or negligence, is as liberal

as any we have examined. It places but one restriction on the amount which may be recovered. That restriction is to be found in the language: '*such damages may be given as under all the circumstances of the case may be just.*'" Id. at 245, 130 P.2d at 862. (Emphasis in original.)

This Court has permitted awards for loss of companionship and guidance and funeral expenses, but has held that the grief suffered by surviving heirs is not a compensable element of damage under the statute. *See Checketts v. Bowman,* 70 Idaho 463, 220 P.2d 682 (1950); *Hepp v. Ader, supra; Wyland v. Twin Falls Canal Co.,* 48 Idaho 789, 285 P. 676 (1930). However, the precise boundaries of damages allowable under the statute have never been completely delineated.

Respondents assert and the trial court held that damages allowable under the statute are limited to compensatory damages. However, neither this Court nor the legislature has ever so expressly stated and indeed in *Wyland v. Twin Falls Canal Company, supra* that question was left open.

 Punitive damages are generally not favored under the law and should be awarded only within narrow limits. *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972); *Lewiston Pistol Club v. Imthurn,* 94 Idaho 264, 486 P.2d 275 (1971). It has been stated that exemplary damages will be awarded only when there is clear evidence that the wrongdoer acted maliciously, fraudulently or with gross negligence. *Bradford v. Simpson,* 98 Idaho 830, 573 P.2d 149 (1978); *Jolley v. Puregro Company, supra.* While an award of exemplary damages is a form of punishment, the primary purpose behind such an award is one of deterrence: "the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the future." *Jolley v. Puregro Company, supra* at 709, 496 P.2d at 946. *See Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972).

As noted in *Cox v. Stolworthy, supra* : "Where actual physical harm is threatened or actually inflicted on a person or persons the situation rises to a serious level of affairs. In such a case where the plaintiff's physical well-being is endangered, a substantial punitive damages award finds justification in the nature of the malicious conduct itself as well as the quality of the injury sustained." *Id.* at 691, 496 P.2d at 690.

*See also Harrington v. Hadden,* 69 Idaho 22, 202 P.2d 236 (1949). Thus, while a wrongdoer may be liable for punitive damages if he injures another, it is argued that punitive damages should nevertheless be withheld if a wrongdoer so injures another as to cause death. We find no logic in such a conclusion. If wrongful conduct is to be deterred by the award of punitive damages, that policy should not be thwarted because the wrongdoer succeeds in killing his victim. To hold otherwise would violate the precept that this Court should avoid a statutory interpretation which produces an absurd result.[1] *Hartman v. Meier, supra.* See also *State of South Dakota v. Brown,* 144 Cal. Rptr. 758, 576 P.2d 473 (Cal.1978); *James v. Carnation Co.,* 278 Or. 65, 562 P.2d 1192 (Or.1977); *Blondheim v. State,* 84 Wash.2d 874, 529 P.2d 1096 (Wash.1975).

As is well stated in 1 Speiser, Recovery for Wrongful Death § 3.4 at 135 (1975): "Insofar as logic and symmetry in law are concerned, it is difficult to under-

---

1. Further evidence of a legislative intent to allow punitive damages under I.C. § 5–311 is provided by a 1971 amendment to I.C. § 5–327. I.C. § 5–327 deals with the survival of causes of action upon the death of the wrongdoer. In 1971, certain language, still existing today, was added to the statute to prohibit an award of punitive damages in an action where the wrongdoer had died. 1971 Session Laws Ch. 209 § 1. That amendment recognizes that the main purpose of punitive damages—deterrence—is destroyed when the wrongdoer dies. The fact that a similar amendment was not made to I.C. § 5–311 is evidence that the legislature did not intend to allow *living* wrongdoers to escape the imposition of punitive damages. *See* 2A Sutherland, Statutes and Statutory Construction § 51.02 (4th ed. C. Sands 1973).

stand why a person *injured* by a drunken driver may recover punitive damages, but why the survivors of the estate of one *killed* by such a driver may not—because of non-specific wording of a wrongful death statute. The nature and quality of the wrongful act should dictate whether its perpetrator should be compelled to respond in more than compensatory damages—not the fortuitous circumstance whether he happens to injure or to kill his victim."

*See also* McClelland, Survival of Punitive Damages in Wrongful Death Cases, 8 U.S.F. Law Rev. 585 (1975); Reynolds, Punitive Damages After Death—Can Tort Law Create Heaven and Hell?, 26 Okla.Law Rev. 63 (1973). *See generally Hennigan v. Atlantic Refining Co.,* 282 F.Supp. 667 (E.D. Penn.1967); *Leahy v. Morgan,* 275 F.Supp. 424 (N.D.Iowa 1967); *Reynolds v. Willis,* 209 A.2d 760 (Del.1965); *Atlas Properties, Inc. v. Didich,* 226 So.2d 684 (Fla.1969); *State ex rel. Smith v. Greene,* 494 S.W.2d 55 (Mo.1973).

We are cited to certain cases holding that punitive damages may not be awarded under wrongful death statutes. Many of those cases involve statutes containing language substantially different than I.C. § 5–311 and we thus deem them inapplicable to the case at bar. *Doak v. Superior Court for County of Los Angeles,* 257 Cal. App.2d 825, 65 Cal.Rptr. 193 (1968); *Downs v. Sulphur Springs Valley Electric Company,* 80 Ariz. 286, 297 P.2d 339 (Ariz.1956), and *Wilson v. Whittaker,* 207 Va. 1032, 154 S.E.2d 124 (Va.1967), all involve wrongful death statutes containing language substantially similar to I.C. § 5–311. *Doak* involved a wrongful death statute allowing damages as "may be just" while *Downs* involved a statute allowing such damages as may be "fair and just." In both cases punitive damage awards in wrongful death actions were denied because of the legislative history of those wrongful death statutes. In both cases the wrongful death statutes had at a prior time expressly allowed punitive damages, but later that language was removed by the legislature. The courts in *Doak* and *Downs* reasoned that

the removal of the punitive damage language from the wrongful death statutes manifested a legislative intent to deny such damages. I.C. § 5–311 has no comparable legislative history, and thus *Doak* and *Downs* are distinguishable from the present case. We further note that since the decision in *Downs* the Arizona Legislature has again amended the wrongful death statute, and it has now been interpreted to allow the imposition of punitive damages. *Boies v. Cole,* 99 Ariz. 198, 407 P.2d 917 (Ariz. 1965).

*Wilson v. Whittaker, supra,* held that punitive damages were not to be awarded under a wrongful death statute permitting such damages as may be "fair and just." That court found the legislative intent behind that statute was not to punish the wrongdoer. We find no evidence of a similar legislative intent behind I.C. § 5–311. Therefore, we decline to follow the reasoning of *Wilson.*

It is argued that the allowance of punitive damages in wrongful death actions brought under I.C. § 5–311 will result in a large increase in the number and amount of punitive damage awards. We do not necessarily agree. A plaintiff must still prove the requisite elements in order to be entitled to punitive damages and they are not favored at law. *Jolley v. Puregro Company, supra.* Although we cannot foretell the future, we are confident that the necessary elements and standards to be met will continue to inhibit the award of punitive damages except in the most unusual circumstances.

█ Appellants have urged as an alternative rationale the allowance of punitive damages in death actions under either a common law or statutory survival action theory. *See Koppinger v. Cullen-Schiltz,* 513 F.2d 901 (8th Cir. 1975); *Reynolds v. Willis,* 209 A.2d 760 (Del.1965); *Smith v. Gray Concrete Pipe Company,* 267 Md. 149, 297 A.2d 721 (Md.App.1972); *Pratt v. Duck,* 28 Tenn.App. 502, 191 S.W.2d .562 (Tenn. 1945); *Worrie v. Boze,* 198 Va. 891, 96 S.E.2d 799 (Va.1957). A survival action is

for the damages the deceased suffered and could have sued for had he survived, while a wrongful death action, in contrast, involves the damages suffered by the heirs of the decedent because of his death such as loss of guidance, support, etc. 2 Harper and James, The Law of Torts § 24.2 (1956).

██ Although this Court has previously indicated its dissatisfaction with the rule of non-survivability, *Doggett v. Boiler Engineering and Supply Co.,* 93 Idaho 888, 477 P.2d 511 (1970), we find it unnecessary to employ a survival action theory in the present case. The majority of cases allowing punitive damages in survival actions involved wrongful death statutes that either expressly or as interpreted did not permit punitive damage awards. We face no such barrier in the present case; our wrongful death statute, as interpreted, allows for punitive damage awards.[2]

## II

We turn now to appellants' contention that the trial court erred in the entry of summary judgment in favor of defendant-respondent State of Idaho. We review this summary judgment in accordance with the well established principles that summary judgment should be granted only if the pleadings, depositions and affidavits show there is no genuine issue as to any material fact, *Casey v. Highlands Insurance Company,* 100 Idaho 505, 600 P.2d 1387 (1979); I.R.C.P. 56(c), and the record and all reasonable inferences arising therefrom must be construed in favor of the party against whom summary judgment is sought. *Palmer v. Idaho Bank & Trust of Kooskia,* 100 Idaho 642, 603 P.2d 597 (1979).

The trial court first held that the State's failure to place warning signs on the highway was not a proximate cause of the collision, reasoning that because Hanson could see the haze long before he entered it, warning signs "would not have provided more notice of the fog or smog than did the

actual and obvious presence of the fog itself." The trial court relied upon *Munson v. State Department of Highways,* 96 Idaho 529, 531 P.2d 1174 (1975). In *Munson* the decedent died when his vehicle collided with a truck which had been stopped on the highway by a flagman for a highway repair crew. There were other assorted vehicles, a flagman and a red stop sign at the site of the accident. Summary judgment therein was granted and affirmed by this Court on the basis that "the driver of an automobile is held to have notice of that which is plainly visible on the highway before him." *Id.* at 531–32, 531 P.2d at 1176–1177. There, as here, appellants had contended that the state was negligent in failing to erect warning signs in advance of the repair site. This Court held that "all this was clearly visible from a considerable distance." *Id.* at 532, 531 P.2d at 1177.

██ We deem the case at bar distinguishable on the facts from *Munson. Munson* involved a clear danger, highly visible on the road before it was encountered. All of the evidence presented was to that effect. The absence of any contrary evidence resulted from the death of all occupants of the decedent's vehicle. It is apparent that one of the main issues in the instant case is the extent of the danger presented by the haze and whether that danger could be fully realized prior to or only after entry into it. The record indicates that Hanson may have been familiar with the haze condition on that particular section of highway but also indicates no familiarity on the part of the Gavicas. There is testimony that the Gavicas appeared to be lost in the haze and that they were traveling at a very slow rate of speed just prior to the collision. The record also demonstrates controversy as to whether the depth and the thickness of the haze could be appreciated by the driver of an approaching vehicle. Here, as in contrast with *Munson,* the assistance which warning signs might or might not have

2. We also note, without deciding, that the use of a survival action theory might be hindered by the fact that the Gavicas died instantly. *See* Prosser, The Law of Torts § 127 (4th ed. 1971);

McClelland, *supra* at n. 49. The suddenness of death does not preclude the use of a wrongful death action. Prosser, *supra* at § 127.

given to approaching drivers was for the determination of a jury.

 The respondents argue nevertheless that the actions of Hanson constituted a superseding, intervening cause of the accident. An intervening cause can become the proximate cause of an injury when the intervening cause was an extraordinary action and was neither anticipated nor a probable consequence of the original negligence. *See Joyner v. Jones,* 97 Idaho 647, 551 P.2d 602 (1976); *Smith v. Sharp,* 82 Idaho 420, 354 P.2d 172 (1960). We deem it clear that there is a material issue of fact as to whether Hanson's actions constituted a superseding, intervening cause of the collision since there is conflict regarding the speed of the truck driven by Hanson when he entered the haze and at the time of impact, and further conflict regarding the density of the haze. (Testimony indicated that the haze's density ranged from clear to almost opaque.) Hence we do not agree that Hanson's actions constituted a superseding, intervening cause of the accident as a matter of law.

 We deem the record to demonstrate the existence of material issues of fact as to whether the State's failure to erect warning signs was or was not the proximate cause of the accident. There is evidence from which reasonable minds could draw different conclusions, and as stated in *Schaefer v. Elswood Trailer Sales,* 95 Idaho 654, 516 P.2d 1168 (1973), "Proximate cause is generally an issue for the jury unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." *Id.* at 656, 516 P.2d at 1170. *See Smith v. City of Preston,* 97 Idaho 295, 543 P.2d 848 (1975). Hence, summary judgment in favor of the State of Idaho on the basis of a lack of proximate cause as a matter of law was erroneous.

The second ground upon which the trial court based its summary judgment in favor of the State was that there existed no duty to warn Hanson of the haze since, as demonstrated by the record, Hanson knew of the existence of the haze and he knew or

should have known of the possibility of colliding with other vehicles while driving through it. The trial court cited *Joyner v. Jones, supra,* which held that a landowner has no duty to warn invitees or licensees of a danger either known by them or so obvious and apparent as to charge them with knowledge of it.

In *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970), it was held that the State owed a duty to motorists on its highways similar to the duty owed by a possessor or owner of land to an invitee. It was there held that the State had a duty to warn of or make safe dangerous conditions on the highways when the following elements were present: (1) the State knew or by the presence of reasonable care would discover the dangerous condition; (2) the State realized that the condition involved an unreasonable risk of harm to those using the highways; (3) the State expected that persons using the highway would not discover or realize the danger; and (4) the persons using the highway did not know or have reason to know of the condition and the attendant risks.

 The trial court was undoubtedly correct in its finding that Hanson was familiar with the haze and the dangers it presented. However, there are unresolved material issues of fact as to the Gavicas' knowledge. The record before us indicates knowledge on the part of the State relative to the haze and to the dangerous conditions that existed therefrom. The record is devoid of any indication that the Gavicas were familiar with the haze condition, that they appreciated the hazards that it presented, or that motorists not familiar with the conditions on that portion of the highway could gauge the depth, thickness or impairment of sight problems presented by the haze. We also note that at the time of the accident, the Idaho Department of Highways possessed statistics showing the number of accidents on that highway which were related to the haze. Based on all of the above, we hold that summary judgment in favor of the State of Idaho on the ground that it had no duty to erect warning signs was erroneous.

The respondent State of Idaho argues that even if the basis upon which the trial court issued summary judgment was erroneous, this Court may nevertheless affirm the judgment on the basis of a correct theory. *E. g., Robison v. Compton,* 97 Idaho 615, 549 P.2d 274 (1976); *City of Weippe v. Yarno,* 96 Idaho 319, 528 P.2d 201 (1974).

Respondents point out that the Idaho Tort Claims Act, which was enacted in response to this Court's decision in *Smith v. State, supra,* while removing the State of Idaho's otherwise immunity for tort liability, does contain certain exceptions. I.C. § 6-904(1) provides:

> *"Exceptions to governmental liability.*—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
>
> (1) Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory·function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."

It is the contention of the respondent State of Idaho that the State's decision not to place signs in advance of this particular area of the highway which would warn motorists that they were approaching a haze area was a discretionary decision and thus the State continued to be immune from liability.

The circumstances presented here are virtually identical to those of *Smith v. State, supra.* In *Smith* this Court held that the sovereign immunity of the State of Idaho from tort liability would no longer constitute a valid defense, and found that under the circumstances of that case, the State had failed to adequately warn approaching motorists of a known dangerous condition on the highway. To that extent, *Smith* is virtually identical to the claim in the case at bar. However, it was only after the decision in *Smith* that the legislature enacted the Idaho Tort Claims Act which continued the immunity status of the State when the actions of it or its employees fell within the purview of a discretionary function.

It was only after the briefing and argument of the case at bar that this Court issued its opinion in *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979) wherein the "discretionary function or duty" language of I.C. § 6-904(1) was at issue. *Dunbar* was an action by the survivors of miners killed in a fire in a mine. That action was brought in part against the State on the theory that the State and its officials had negligently conducted mine inspection programs. In *Dunbar* we noted that that action was essentially concerned with· the abilities of officials, the enactment of regulations, and the alleged lack of *enforcement* of statutes, regulations and standards. We further noted that such governmental activities having to do with the enforcement of standards and regulations had no parallel in the private sector. Therein *Smith* was distinguished on the basis that the actions of the State in *Smith* (and in the case at bar) do have a parallel to the private sector and can be analogized to a landowner's failure to warn of known dangerous conditions on his property.

If a private person or business negligently allowed a dangerous condition to exist in a stairway or elevator and thereby caused injury, we would find the breach of a duty. No less so should we find a breach of a duty on the part of the state or a county which negligently maintained a dangerous condition on a stairway or elevator of a statehouse, courthouse, or other government operated building. We see no distinction between those situations and the negligent maintenance of a known dangerous condition of a highway, owned, operated and maintained by the State and upon which the public is invited to travel. Thus, unlike *Dunbar,* the State's action in the case at bar has a parallel in the private sector,

and the State, under the Idaho Tort Claims Act, bears the same duty as does a private landholder. Hence, we hold that the State's alleged negligence is not immunized by the "discretionary function or duty" exception to governmental liability found in I.C. § 6–904(1).

The summary judgment in favor of the State of Idaho is reversed and the cause is remanded for further proceedings consistent herewith. Costs to appellants.

DONALDSON, C. J., and McFADDEN and BISTLINE, JJ., concur.

BAKES, Justice, concurring in Part I and dissenting in Part II:

I am compelled to dissent from Part II of the Court's opinion. The district court properly entered summary judgment in favor of the defendant respondent State of Idaho. The record before the court on the defendant state's motion for summary judgment indicates plainly that the state's failure to erect signs on I–15W warning drivers of low visibility conditions existing adjacent to the J. R. Simplot Co. and FMC Corporation facilities was, even if negligent, not a proximate cause of the collision which caused the Gavicas' deaths.

Where the record before the trial court shows no genuine issue of material fact, entry of summary judgment is proper. Although the pleadings, depositions and affidavits must be construed most favorably to the party opposing the motion for summary judgment, *Farmers Insurance Co. v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976), a mere scintilla of evidence will not create a genuine issue of fact. *Jephson v. Ambuel*, 93 Idaho 790, 473 P.2d 932 (1970). The record before the trial court on motion for summary judgment supports his conclusion that the failure of the state to post warning signs in the area adjacent to the two manufacturing plants was not a contributing factor to the collision.

Defendant Hansen, the truck driver, testified in his deposition that he had traveled the section of highway upon which the accident occurred more than fifty times and that he was very familiar with that piece of road. Hansen testified that he had in the past encountered fog conditions on I–15W in the area of the Simplot and FMC manufacturing plants, although those conditions were not as severe as those which existed on December 22, 1974. More important for purposes of considering the state's motion for summary judgment, Hansen testified that he observed the smog or fog bank lying across the highway on December 22, 1974, well before entering into it. Under questioning by the attorneys for the various parties in the case at his deposition, Hansen presented the following testimony:

"Q. How far did you proceed from the time you initially slowed down or began slowing down until the impact of the collision?

"A. The distance you say?

"Q. Yes.

"A. Oh, I couldn't give you the number of feet because you couldn't—I couldn't even see the overhead bridge.

"Q. When you say couldn't see the overhead bridge, you're referring to the overpass directly north of the industrial plants?

"A. Yes.

"Q. You don't know what number that is or what off ramp that is?

"A. Fifty-eight.

. . . . .

"Q. Now, what is the general condition of the highway as you proceed eastbound with regard to being level, being an upgrade or downgrade from the point of the overpass at Exit 58 to the point of the collision?

"A. There is a downgrade.

"Q. And what was the condition of the visibility? You say you couldn't see the overpass. What could you see at that point?

"A. I could see the white lines right beside the truck. That's all I could see.

"Q. You had almost no forward visibility?

"A. That's correct.

. . . . .

"Q. When you arrived at Exit 58, then what did you observe as to visibility on the roadway ahead of you going east, we'll call it?

"A. Well, some smoke going across the road.

"Q. Was there very much smoke in that area or was—well, was there very much smoke in that area?

"A. Yes.

"Q. When was it that your visibility became quite limited?

"A. Underneath the overpass.

"Q. Underneath the overpass?

"A. Well, in the overpass area.

"Q. Well, now, when we talk about the overpass area, we are speaking in pretty general language. Would it be down more toward the bridge across the Portneuf or just what was it, if you could describe it to me?

"A. Well, pretty much in the overpass area.

"Q. Would you say that it was any less dense in the overpass area by Exit 58 than it was down toward the bridge?

"A. Well, the bridge itself was so thick I couldn't even see it.

. . . . .

"Q. What was your visibility from Exit 58, then, down to the point where the accident happened?

"A. I followed the white lines along the side of the truck.

. . . . .

"Q. You know where Exit 58 is, don't you?

"A. Yes.

"Q. You were aware on this particular day when you passed Exit 58, weren't you?

"A. Not the exact position of Exit 58, no.

"Q. Why weren't you aware of the exact position of Exit 58?

"A. It was covered with smoke.

"Q. The exit itself?

"A. Yes..

"Q. Your testimony, then, to me at this time is that the fog, whatever it was, was so dense at Exit 58 or in that area that you could not see it?

"A. That's correct.

"Q. And did it continue to be that dense clear down to the Portneuf River bridge?

"A. It was letting up at the Portneuf bridge.

"Q. What do you mean by letting up?

"A. Not quite as dense.

"Q. Yet at this point, as I have understood what you have told me, was that you were driving by observing the white lines along the edge of the roadway?

"A. That is correct.

"Q. And that there was no forward visibility as far as you were concerned?

"MR. SWEET: That's not his testimony.

"Q. What is your testimony?

"A. I followed the white lines.

"Q. Why did you follow the white lines?

"A. So I could stay on the road.

"Q. Was that because you couldn't see ahead of you?

"A. That's correct."

The record indicates that the distance between the Exit 58 overpass and the point of impact was approximately 400 yards.

In the record before the district court on the summary judgment motions was also a deposition by Richard Alexander who was driving on I–15W in the area of the accident just prior to the collision. Alexander overtook and passed the Gavica automobile in the fog bank and shortly thereafter observed the Gavica automobile emerging from the cloud and being pushed off the road by defendant Hansen's semi-truck. With respect to his ability to observe the fog bank prior to entering it, Alexander testified as follows:

"Q. When is the first time that you remember seeing the actual fog? How far were you away? Do you have any idea?

"A. Two hundred to five hundred yards from it maybe as a guess.

"Q. What was your approximate speed at this time?

"A. I was going the speed limit, probably 50 to 55.

"Q. Okay. Did you react in any way when you saw this fog bank?

"A. Yes. I proceeded cautiously into it.

. . . . . .

"Q. Proceeding cautiously, do you mean that you slowed down?

"A. Yes.

"Q. Okay. Do you remember what speed that you finally got to?

"A. I was either stopped or going very slowly in the fog.

. . . . . .

"Q. When you first saw the fog bank before you entered it, how far were you away from it when you were traveling the speed limit, 50 to 55?

"A. I would say that I was maybe 400 yards, 500 yards. That's—

"Q. Would you have already at that time gone under the overpass?

"A. I think if I hadn't have gone under the overpass, I don't think I could have seen the river bridge or the area near the river bridge 'cause there's a hill there I believe or a curve or—

"Q. So you feel like—

"A. And so apparently there was some distance where I came into the open to where I could see the river, the area near the bridge. When I came to a point, I had enough time to slow down and—I saw it coming some distance, three, four hundred yards maybe.

. . . . . .

"Q. Okay. Now, from the time you first saw the fog near the Portneuf River until the time you entered it, did you have enough time to slow down?

"A. Yes.

"Q. You didn't feel threatened in any way in not being able to slow down adequately?

"A. No. I had time to slow down for it. I did slow down for it.

"Q. When you first encountered the Gavica vehicle, did you sense any danger that you were going to somehow collide with that vehicle?

"A. I don't believe so. I did stop in time to where I wasn't afraid of hitting them. It scared me thinking, or scares me now even, what could have happened had I not stopped in time. But I did.

"Q. Okay. And you felt in control at all times?

"A. Yes. I was in control of the Gavica vehicle or of not hitting the Gavica vehicle I felt."

In another deposition before the court, David Terry, a detective for the Bannock County sheriff's office in Pocatello and the first law enforcement officer to arrive at the accident scene, testified that at the time he arrived at the scene the west edge of the fog bank began rather abruptly near the Portneuf River and was clearly visible from the Exit 58 interchange, from which Terry entered the interstate highway, several hundred yards from the reduced visibility area.

"Q. (By Mr. Gallafent) Going east on the on ramp, as you turned east onto the on ramp you could see the fog bank?

"A. Yes, you could.

"Q. Did you go at normal speed on the on ramp, then, what I mean is speed for clear conditions?

"A. Yes, I did.

"Q. Then when you got to the fog bank you immediately slowed down to ten or fifteen miles per hour; is that right?

"A. Yes, I did, for my own safety."

Terry's deposition reflects also the very dense character of the fog which lay across the roadway.

"A. Well, I first run into it just, oh, I don't know how many feet exactly this side of the bridge, I slowed and followed close to the guardrail, proceeded with caution or however, along watching the guardrail, concrete bridge, going across that, which I didn't have anything to follow from the other side. Following slowly along the interstate, say, ten or fifteen miles an hour again, we have a turnoff or a crossover which is used strictly by emergency vehicles, vice versa, on all of your interstates. Just before approaching that it started to break up

and off to my right I could see the accident scene at that point. I am not sure how many feet that is from the bridge to that crossover."

The district court properly concluded that, as a matter of law, the defendant State of Idaho's failure to erect signals warning motorists of reduced visibility was not a proximate cause of the accident. The fog or smog bank was clearly visible to approaching drivers from a distance sufficient to enable them to slow to a safe speed prior to entering into the bank. Defendant Hansen's deposition indicates that he in fact did see the dense cloud of vapor enveloping the roadway some several hundred yards before the site of his collision with the Gavica automobile. *Munson v. State Dept. of Highways*, 96 Idaho 529, 531 P.2d 1174 (1975), is not distinguishable on any relevant basis, as the majority asserts, and amply supports the district court's summary judgment granted in the defendant State of Idaho's favor. This Court held in *Munson* that "[t]he driver of an automobile is held to have notice of that which is plainly visible on the highway before him." 96 Idaho at 531, 531 P.2d at 1176–77. As in *Munson*, signs on I–15W would not have proven more visible than the danger on the road itself.

The majority apparently concedes that the presence of warning markers would not have provided Hansen with any greater awareness of the hazard than he did have. The majority, however, *ante* at 866, somehow finds it significant that the record evidences no familiarity with the road on the part of the Gavicas. The majority posits that warning signs may have aided the Gavicas in coping with the fog enshrouded highway. The evidence, however, is clear that the Gavicas were traveling through the fog very slowly in their own lane of traffic, exactly what one would have expected them to do if they had received advance warning of the road hazard. Officer Terry, who was very familiar with I–15W at the point of the collision, testified that he

passed through the fog at ten to fifteen miles per hour while using the guardrails on the right of the roadway to locate the traffic lane. Alexander testified that he "either stopped or [was] going very slowly" upon entering the fog and that he proceeded at speeds he estimated at ten to fifteen miles an hour through the fog area after passing the Gavica automobile. It is uncontested that visibility in the fog bank was extremely limited. Defendant Hansen stated that he had almost no forward vision and that he guided his semi-truck on the roadway by watching the white painted line down the side of the highway.

I.C. § 49–701(a), in effect in 1974 at the time of the collision, provided as follows: "49–701. Basic rule and prima facie limits.—(a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care." [1]

Certainly, where the uncontradicted testimony was that there was virtually no visibility in the fog bank, the Gavicas could not have been expected to do other than they did, *i. e.*, drive very slowly through the fog, even if the state had posted signs warning traffic of the fog area.

The majority appears to place some weight on Mr. Alexander's testimony that in his opinion the Gavicas "appeared to be lost" while they were traveling through the fog just prior to the collision. In ruling on a motion for summary judgment, the district court must consider only facts which would be admissible at a trial and not opinions or conclusions as to the significance of the evidence. *Yribar v. Fitzpatrick*, 87 Idaho 366, 393 P.2d 588 (1964). Alexander's opinion that the Gavicas "appeared to be lost" was not competent evidence to con-

---

1. I.C. § 49–701, as quoted, was effective in 1974. The statute was repealed in 1977. The substance of I.C. § 49–701 now appears as I.C. § 49–681.

**70**

sider in the summary judgment proceedings, and further was irrelevant to whether the state's failure to post warning signs was a legal cause of the subsequent ramming of the Gavicas' automobile by Hansen's truck. The uncontradicted competent evidence before the district court was simply that the Gavica automobile was traveling very slowly through the dense fog in the righthand traffic lane of the highway. The Gavicas did exactly what they should have done under the circumstances and what they undoubtedly would have done even in the presence of advance warning of the fog given them by highway markers. The truck driver Hansen, though aware of the fog/smoke condition sufficiently far in advance to reduce his speed to a safe level, nevertheless proceeded into the fog at an excessive rate of speed and continued to drive in the fog at an excessive rate of speed, while watching the painted stripe down the side of the road in order not to run off the highway. The trial court correctly followed our decision in *Munson, supra*, in concluding that the negligence of the state, if any, in failing to post a sign warning of the reduced visibility ahead was not a proximate cause of this accident.

I would affirm the district court's summary judgment entered in the defendant respondent State of Idaho's favor.[2]

---

2. Neither the trial court below nor this Court on appeal has addressed the effect of I.C. § 6–904(8) on the state's possible liability for the Gavicas' deaths. That section reads as follows:

"6–904. Exceptions to governmental liability.—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

. . . . .

"(8) Arises out of a plan or design for construction or improvement to the highways, roads, streets, bridges, or other public property where such plan or design is prepared in substantial conformance with engineering or design standards in effect at the time of preparation of the plan or design, approved in advance of the construction or approved by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval."

The district court on remand will have to consider the effect of this statute.