667 P.2d 859

Alyce MURPHY and Bill Murphy, wife and husband, Plaintiffs-Respondents,

v.

Dr. Frederick L. WOOD, III, and Dr. S.J. Kassis, Defendants-Appellants,

and

Joe Dokes I Through V, the Cassia Memorial Tumor Board, John Does I Through XXX, the Cassia Memorial Hospital and Medical Center, Intermountain Health Care Services, Inc., and ABC Corporation, Defendants-Respondents.

No. 14434.

Court of Appeals of Idaho.

July 27, 1983.

Richard C. Fields of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-appellant, Kassis.

J. Robert Alexander of Benoit & Alexander, Twin Falls, for defendant-appellant, Wood.

Steven A. Tuft of Church, Church, Snow & Tuft, Burley, for defendants-respondents, Cassia Memorial Tumor Bd., Cassia Memorial Hosp. and Medical Center, Intermountain Health Care Services, Inc.

Kenneth L. Pedersen and Brent H. Nielson of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiffs-respondents, Murphy.

SWANSTROM, Judge.

In 1973 the Idaho Legislature enacted a medical privilege and immunity statute offering protection from disclosure and use at trial of certain records of in-hospital medical staff committees and medical societies engaged in research, discipline and medical study. Now two doctors, who are being sued in a malpractice action, are trying to overcome the statutory privilege so they might be able, at trial, to introduce evidence favorable to their defense. The district court ruled against them. The judge barred discovery of and future use at trial of certain records, statements and activities of a hospital medical staff committee. The two doctors appeal from the interlocutory orders. We affirm, but with modification.

This appeal involves the district judge's interpretation of the statute (I.C. §§ 39–1392 to –1392e) and his application of the law to the unusual circumstances of this case.

The facts are yet to be established. However, a brief summary of the parties' allegations will help to understand the specific issues. In 1978, Alyce Murphy was examined and found to have cervical cancer. On July 11, her physician, Dr. Wood, participated in a meeting of the Cassia Memorial Tumor Board. The tumor board meets monthly at Cassia Memorial Hospital to discuss cancer cases currently being treated by staff physicians. The membership of the board includes not only local physicians but cancer experts from the University of Utah Medical Center and the LDS Hospital in Salt Lake City. Dr. Wood

alleges that he presented the facts of Alyce Murphy's case to the board, and that the board recommended a hysterectomy.

Dr. Wood later performed a hysterectomy. Dr. Kassis assisted in the operation by helping prepare Alyce Murphy for surgery. Alyce Murphy alleges that following the operation she suffered from a deterioration of both memory and speech. She attributes these problems to complications arising from the operation. She alleges that her prior illnesses and poor physical condition made surgery a risky form of treatment for her cancer. In part, her complaint against Drs. Wood and Kassis is that the doctors were negligent in performing surgery when an alternative, radiation therapy, would have been as effective and less risky. She also claims that Dr. Wood, a general practitioner, breached the standard of care in the Burley area by failing to obtain a second, expert opinion before operating.

To defend against these claims, Dr. Wood wants to offer evidence at the trial that he did seek a second opinion when he presented Alyce Murphy's case to the tumor board, and that the board recommended a hysterectomy. Dr. Wood contends that it is the standard of care in the Burley area for general practitioners, in treating cancer cases, to seek recommendations from the board as a substitute for a consultation with a specialist. Drs. Wood and Kassis argue that they will not be able to fully defend themselves against Alyce Murphy's charges unless they can present evidence relating to the July 11 meeting.

The Murphys have also sued the tumor board for its alleged recommendation of surgery. Initially the Murphys attempted, through the discovery process, to take the deposition of doctors who participated in the July 11 meeting of the tumor board. Later the Murphys abandoned these attempts and filed a motion in limine to bar the admission of any evidence relating to the Cassia Memorial Tumor Board's meeting of July 11. Only Drs. Wood and Kassis opposed the Murphys' motion. The other defendants, relying upon the statutory privilege that we discuss more fully later, joined the Murphys in urging the court to rule that the statute barred the disclosure and use of the evidence the two doctors were seeking. The court granted the Murphys' motion in limine. Later, after Drs. Wood and Kassis moved for reconsideration, the court affirmed its earlier order and issued a protective order precluding the discovery of evidence relating to the meeting. By certification the Supreme Court has permitted Drs. Wood and Kassis to appeal from these interlocutory orders.

The policy of the Idaho statute is set out in I.C. § 39–1392:

> To encourage research, discipline and medical study by in-hospital medical staff committees and recognized medical societies for the purposes of reducing morbidity and mortality, enforcing and improving the standards of medical practice in the state of Idaho, certain records of such committees and societies shall be confidential and privileged as set forth in this chapter.

Idaho Code § 39–1392b provides in part:

> Except as provided in § 39–1392e, all written records of interviews, all reports, statements, minutes, memoranda, charts, and the contents thereof, and all physical materials relating to research, discipline or medical study of any in-hospital medical staff committees or medical society, *for the purposes set forth in section 39–1392,* shall be confidential and privileged, and shall not directly or indirectly [be] subject to subpoena or discovery proceedings or be admitted as evidence, nor shall testimony relating thereto be admitted in evidence, or in any action of any kind in any court or before any administrative body, agency or person for any purpose whatsoever.... [Emphasis added.]

Drs. Wood and Kassis argue that the evidentiary privilege established by I.C. § 39–1392b does not apply to cases where the hospital medical staff committee recommends to a physician a course of treatment for a particular patient. Drs. Wood and Kassis contend that the privilege only applies where the medical staff committee is pursuing "research, discipline and medical

study." They assert that the committee was not so engaged in those purposes when it discussed Alyce Murphy's case on July 11, 1978 and made specific recommendations for her treatment. This activity, they assert, was but a part of the process of the patient's care and the statute should not even apply. We will address this threshold question first.

## WHETHER THE ACT APPLIES

The trial judge found that the tumor board meeting of July 11, 1978, was a meeting of an in-hospital medical staff committee, conducted for the purposes of research and medical study. He viewed the privilege statute as one providing a comprehensive exclusion not limited to retrospective disciplinary hearings, but extending broadly to records and findings of an in-hospital medical staff committee engaging in research and medical study. The judge concluded that the activities of the board came within the statute and were privileged.

The judge's findings are supported by substantial, competent evidence in the record. That record includes the deposition of Dr. Wood and affidavits of other participants in the board's meetings. The affidavit of Dr. Kircher, then chairman of the tumor conference (board), stated in part:

The Tumor Conference was established to conform with educational guidelines of the American College of Surgeons, Commission on Cancer, as a continuing medical education program, to educate, train and assist physicians in caring for cancer patients.... The two main purposes of the Tumor Conference are: (1) education regarding the latest and best methods of tumor diagnosis and treatment; and (2) to conduct a survey of tumors and cancer occurrence and to forward such data to the Idaho Central Tumor Registry, which body maintains statistical profiles regarding cancer occurrence for research purposes.... Though actual case histories of current patients are used as the subject matter of the educational seminar, the presenting physician has no obligation to follow the "recommendations" of the

conference participants, and is free to use and, in fact, is still expected to use, his own independent professional judgment as to what course to take with regard to his own patient. The "recommendations" are intended to be a summary of the group's decision as to the best treatment plan available that could be devised during the course of discussion.

We will assume that the tumor board did discuss current care and treatment of Alyce Murphy; and that the board made a recommendation for surgery. Nevertheless, this activity is not shown to be inconsistent with the purposes set forth in the statute, nor are we convinced that the committee deviated from the purposes stated in Dr. Kircher's affidavit. Dealing with actual current patient cases, rather than hypothetical or former case histories, could result in immediate, pragmatic benefits to patients from such medical studies and educational processes. In our view this hardly detracts from the main purposes of the tumor board. We therefore readily agree that the board's activities in this instance come within the scope of the act.

The thrust of the Wood-Kassis argument is that by enacting I.C. § 39–1392b the legislature only sought to protect the kind of candid retrospective peer review and critique of cases which can be expected to lead to the improvement of the quality of care to the general public. They argue that this subsection of the statute should be construed so that the privilege it creates only applies to cases where staff committees function retrospectively and meet for purposes of self-evaluation and review, not to cases where the committee gets involved in current patient care. Their argument is supported by cases construing statutes providing for peer review, *e.g., Tucson Medical Center, Inc. v. Misevch*, 113 Ariz. 34, 545 P.2d 958 (1976), and by cases in which a privilege for such purposes has been judicially created. *See Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249, 51 F.R.D. 187 (D.C.Dist.1970), aff'd. 479 F.2d 920 (1973).

However, in the present case we are dealing neither with a judicially created privi-

lege nor with statutes limited to peer review. Idaho, like several other states, has enacted a statute which extends privilege and confidentiality to the proceedings of hospital committees meeting for purposes such as medical study and research. *Compare,* Cal.Evid.Code §§ 1156–57 (Supp. 1982); Okla.Stat. tit. 63, § 1–1709 (1981); Tex.Civ.Stat., art. 4447d (1976).

Appellants urge us to construe our statute narrowly, to hold that it grants privilege and protection only for retrospective discussions in peer review situations. Respondents urge that the statute deserves a broader application. Where the meaning of a statute is clear and apparent we are duty bound to recognize and follow that meaning. This principle, unfortunately, does not help us with some parts of this statute. However, the statement of purpose says that the act is intended "to encourage research, discipline and medical study." I.C. § 39–1392. We believe that this language—construed with the language of the other parts of the act—plainly means that the act should have broader application than merely to peer review situations. While other parts of the act do not add clarity, they do not undermine these broader purposes.

To the extent that the meaning of the statutory language is not clear—as is the case with some provisions we discuss later—we must try to give effect to the legislature's intent in enacting the statute. *Gavica v. Hanson,* 101 Idaho 58, 608 P.2d 861 (1980). All sections of the applicable statutes should be considered and construed together to determine the intent of the legislature. *Magnuson v. Idaho State Tax Commission,* 97 Idaho 917, 920, 556 P.2d 1197, 1200 (1976). Each section of a statute must be construed "in light of the purpose for which the legislature enacted the particular act, of which such section is a part." *Bush v. Oliver,* 86 Idaho 380, 383–84, 386 P.2d 967, 969 (1963). Some indicia of legislative intent may be shown by the statement of purpose attached to House Bill 136 when this legislation was introduced in 1973:

It is essential to the preservation of optimum medical care that the medical profession within Idaho be free to review patient care and to constantly enforce and improve the standards of medical practice within the state. Such intraprofessional action and review is inhibited and discouraged by present law, however, because of the lack of privilege for any proceedings or records which may be developed and the threat that such materials may be obtained by third parties, perhaps misinterpreted and used in litigation, against the practitioner.

This bill would impose a confidential and privileged status upon certain reports, records and other materials developed by in-hospital medical staff committees, medical society committees and other approved entities concerned with research, discipline and medical study. It would also encourage the free exchange of information in such proceedings by granting civil immunity to persons providing information or opinions to such review and study committees. Access to and court room use of individual patients' records would not be affected.

In viewing the act as a whole, including this statement of purpose, we believe that the legislature intended to establish a broad privilege for the records and proceedings of hospital medical staff committees. The privilege extends to all discussions and proceedings by hospital staff committees, conducted for the purpose of research, discipline or medical study. Such confidentiality is in the public interest because it encourages a free exchange of medical information that will ultimately benefit the public in the form of improved medical care. We conclude that the Idaho statute was intended to provide broader protections of confidentiality, privilege and immunities than are afforded by mere peer review statutes.

## WHETHER EXCEPTIONS APPLY

Drs. Wood and Kassis next contend that the records and minutes of the conference are admissible as evidence under one or

more of the exceptions to I.C. § 39–1392b enumerated in § 39–1392e, containing the following sub parts:

(a) In the event of a claim or civil action against a physician or a hospital arising out of a particular physician-patient or hospital-patient relationship, or which concerns the sufficiency of the delivery of particular health care to a specific patient, any hospital or medical society having information of the kind covered by § 39–1392b shall, when interrogated as hereinafter provided, advise any such claimant who is or was such a patient or who, in a representative capacity, acts on behalf of such patient or his heirs, as follows: (1) whether it has conducted or has in progress an inquiry, proceeding or disciplinary matter regarding the quality [or] propriety of the health care involved, which concerns the subject patient while he was under the care or responsibility of a member of such society or while he was a patient in such hospital; and if so, (2) whether disposition of any kind resulted or will result therefrom; and, if so, (3) what the disposition was, or, if not yet determined, approximately when it will be determined. Such disclosure of information shall be limited to the medical society or hospital committee's actions in connection with the physician or hospital against whom such claim is asserted.

(b) Such a claimant shall likewise be entitled to inquire of such hospital or medical society respecting the names and addresses of persons who such hospital or society knows to have direct knowledge of the provision of the health care in question, such inquiry to be limited, however, to the particular patient and the particular times and occasions germane to the specific occurrences on which the claim is based; provided, names shall not be disclosed respecting persons who have gained secondary knowledge or formed opinions respecting the matter solely by participating as witnesses, officials, investigators or otherwise on, for, or in connection with such a committee, staff, governing board or the state board of medicine.

. . . .

(d) Such disclosures may be voluntarily made without judicial order or formal discovery if all disciplined, accused or investigated physicians consent thereto, and if privileged or confidential information regarding any other patient, physician or person will not be disclosed thereby. When the terms of this paragraph are complied with, such voluntary disclosures may be made without civil liability therefor as if in due response to valid judicial process or order.

(e) If any claimant makes such inquiry of any such hospital or society, he shall be deemed to have consented to like inquiry and disclosure rights for the benefit of all parties against whom he asserts such claim or brings such suit or action, and all other persons who are parties to such action, and thereafter all such persons and parties may invoke the provisions of this section, seeking and securing specific information as herein provided for the benefit of such claimant, to the same extent as the same is allowed to such claimant.

■ Drs. Wood and Kassis argue that under subsection (e) they should be permitted at trial to introduce evidence that the tumor board considered Alyce Murphy's case and recommended that she undergo a hysterectomy. We cannot agree with this argument. In this case it seems clear that subsection (e) of § 39–1392e must be read in conjunction with subsection (b). *Magnuson v. Idaho State Tax Commission, supra.* Subsection (e) merely provides that if a claimant makes inquiry under subsection (b) for disclosure of the names of persons having direct knowledge concerning his case, he has consented to disclosure of such information to other parties. This subsection does not entitle Drs. Wood and Kassis to disclosure of any of the records or minutes of the tumor board meeting of July 11, 1978. Nor does it permit them, as they suggest, to present evidence at trial that the board

recommended that Alyce Murphy undergo an operation.

■ Drs. Wood and Kassis also contend that subsection (d) permits introduction of evidence concerning the tumor board meeting. This argument likewise fails. Subsection (d) only makes sense if read in conjunction with subsection (a). Subsection (a) merely provides that, in the event of a civil action against a hospital or physician, a "claimant" may inquire of the hospital whether a hospital committee has conducted or is conducting a disciplinary investigation concerning the propriety of the health care involved. If such an inquiry is made, the hospital must also disclose the results of the investigation. Subsection (d) simply provides that such information may be disclosed voluntarily, without the need for formal discovery or judicial order if all the disciplined or investigated physicians consent. It seems clear that subsection (a) to which subsection (d) relates, has no bearing on the situation in which the parties find themselves in this case. The "claimants," Mr. and Mrs. Murphy, are not now seeking any information under subsection (a). In fact, they now oppose such disclosure; and this subsection does not contain any other mechanism for Drs. Wood and Kassis to compel disclosure.

Finally, Drs. Wood and Kassis contend that the records of the tumor board meeting are discoverable and admissible under I.C. § 39–1392e(f). That subsection provides:

> If any physician, patient, person, organization or entity whose conduct, care, chart, behavior, health or standards of ethics or professional practice is the subject of investigation, comment, testimony, dispositive order of any kind or other written or verbal utterance or publication or act of any such hospital or society or any member or committee thereof in the course of research, study, disciplinary proceeding or investigation of the sort contemplated by this act, makes claim or brings suit on account of such hospital or society activity, then, in the defense thereof, confidentiality and privilege shall

be deemed waived by the making of such claim, and such hospital, society and the members of their staffs and committees shall be allowed to use and resort to such otherwise protected information for the purpose of presenting proof of the facts surrounding such matter, and this provision shall apply whether such claim be for equitable or legal relief or for intentional or unintentional tort of any kind and whether pressed by a patient, physician or any other person, but such waiver shall only be effective in connection with the disposition or litigation of such claim, and the court shall, in its discretion, enter appropriate orders protecting, and as fully as it reasonably can do so, preserving the confidentiality of such materials and information.

Drs. Wood and Kassis suggest that when a physician, who happens also to be a member of a medical staff committee, is sued in a medical malpractice action, the mere bringing of the claim waives the confidentiality and privilege of the committee records pertaining to the claim. We believe that such a reading of I.C. § 39–1392e(f) comports neither with a literal reading of the statute nor with the intent of the legislature in establishing a broad privilege for the records of medical staff committees.

■ The relevant language of subsection (f) states:

> If any ... patient ... whose ... care ... is the subject of ... comment ... of any such hospital or society ... or committee thereof in the course of ... study ... makes claim ... *on account of such hospital or society activity,* then, in defense thereof, confidentiality and privilege shall be deemed waived by the making of such claim, and such hospital, society and the members of their staffs ... *shall be allowed to use ...* such otherwise protected information.... [Emphasis added.]

Here, a patient whose care was the subject of discussion by a medical staff committee filed a lawsuit against the committee on account of its "activity," i.e., its alleged recommendation to Dr. Wood that a hyster-

ectomy be performed. The suit is also against Drs. Wood and Kassis, but they are being sued not "on account of" any activity of the tumor board, but because of the alleged negligence of the doctors independent from any board activity. Thus, that part of the Murphy's suit which is directed against Drs. Wood and Kassis does not activate the waiver provisions of subsection (f). Any waiver would have to be triggered by that part of the suit which is directed against the tumor board.

██ Because the Murphys have made a claim against the hospital and tumor board "on account of" the board's activity, the board and the hospital are "allowed to use ... otherwise protected information" in defense. However, the hospital and the board have not yet chosen to do so. Unless or until the board or hospital discloses protected information in defense of the Murphys' claim, Drs. Wood and Kassis have no access to the information under subsection (f).

### THE SCOPE OF THE MOTION IN LIMINE

Drs. Wood and Kassis finally contend that the court's order dated November 18, 1981, granting Alyce Murphy's motion in limine is overbroad. In this order, the court determined that:

> All interviews, reports, statements, minutes, memoranda and charts and the contents thereof, and all physical materials relating to research, discipline and medical study, regarding the tumor conference held at the Cassia Memorial Hospital and Medical Center on July 11, 1978, [are] inadmissible as evidence in the above entitled action. *Additionally, all testimony relating thereto shall be inadmissible as evidence in the above entitled action.* [Emphasis added.]

Drs. Wood and Kassis contend that the court's order is overbroad because it forbids them to offer *any* evidence concerning the tumor board meeting of July 11, 1978. Specifically they object because it prevents Dr. Wood from testifying that he discussed Alyce Murphy's case with the board and

received a recommendation that surgery be performed.

██ We believe that the court's order forbidding all testimony concerning the tumor board meeting was proper. Idaho Code § 39–1392b not only states that the records and proceedings of hospital staff committees are confidential and privileged, but also states that no "testimony relating thereto [shall] be admitted in evidence." Any testimony by Dr. Wood concerning what happened at the meeting of July 11, 1978, falls within this prohibition. This interpretation is consistent with the broad privileges created to protect the confidentiality of the proceedings of hospital medical staff committees. However, application of this ruling must be fair and evenhanded at trial. It would not be fair to lift the privilege enough so the doctors could merely show a consultation had occurred and a recommendation had been made, while denying the Murphys an opportunity to fully cross-examine committee members as to the nature of the recommendation and its basis.

On the other hand, it would be equally unfair to prevent the doctors from showing that Dr. Wood had consulted with the tumor board on July 11, if the Murphys were permitted to suggest or argue to the jury that the doctors had failed to comply with a local standard of care by not seeking a second opinion before operating. It would also be a distortion of the truth. Sound public policy will not permit such a misrepresentation of fact to be made to a jury. To hold otherwise in this case would be to allow the Murphys to turn the shield of the privilege statute into a sword with no opportunity being given to Drs. Wood and Kassis to defend themselves.

Dr. Kassis filed a motion in limine to preclude the Murphys "from misleading the jury with evidence or suggestions that no consultation occurred and that any issue as to the presurgical consultation be removed from trial." This motion was denied by the district judge by order dated December 12, 1981. This order, by itself, was not error. However, as we have noted, unfairness and inaccuracy may result from its application

if the Murphys are allowed, at trial, to urge or suggest negligence on the part of the doctors for failure to seek a qualified second opinion. Accordingly, we direct the district judge to modify his order of December 12, 1981, in accordance with the views expressed herein.

With this modification, we affirm the orders of the district court. We remand the case for further proceedings. No costs allowed.

WALTERS, C.J., concurs.

BURNETT, Judge, specially concurring.

I join in the Court's opinion. It should be emphasized that this appeal would not have arisen but for a local standard of medical practice which, we are told, allows a recommendation from a committee like the tumor board to be substituted for a second opinion from a consulting physician. I write separately to suggest that any such local standard should be re-examined.

As today's opinion demonstrates, our Legislature has erected formidable barriers to disclosure of certain activities conducted by in-hospital medical staff and medical society committees. When such a committee is thrust, perhaps unwittingly, into the role of a substitute consultant, there are potential pitfalls for both doctor and patient. Unless all affected parties consent to voluntary disclosure of information, the primary physician cannot fully explain in court the basis of his decisions relating to patient care. Conversely, the patient is relegated to asserting a claim of malpractice before he can make even a limited inquiry to the committee about its evaluation of his case. Moreover, the committee is immune from any civil liability for its "use" of information concerning the patient. I.C. § 39–1392c.

The result is anomalous. Although a local standard of practice may treat the committee as a consultant, the committee has little accountability toward, or duty to communicate with, the doctor and his patient. It is, in truth, a phantom consultant.

I do not suggest that committees like the tumor board should discontinue evaluating current cases. The case method is a valuable tool in medical study. Unless a patient is deceased or entirely cured, any review of his case will afford an opportunity for a committee to recommend appropriate care. It would be absurd to suggest that a committee engaged in medical study should be limited to the cases of dead people or healthy people. It would also defeat the humanitarian purposes of I.C. § 39–1392 if the committee's statutory protection were deemed to cease whenever its medical study gave rise to a recommendation for proper patient care.

However, the problem of the phantom consultant remains. I believe the solution in future cases lies not in narrowing § 39–1392 by judicial construction, as we were asked to do here. Rather, the problem should be addressed directly by modifying the local standard which treats the committee as a substitute consultant. In my view, no local standard should accord a committee consultation the weight of a second opinion unless all parties—the patient, his doctor, and the committee itself—unanimously agree in advance to full disclosure of committee proceedings concerning that patient. If the committee will not so agree—thereby signifying its unwillingness to take on the responsibilities of a genuine consultant—the case might still be submitted to the committee for educational purposes. But the doctor and his patient should obtain any required second opinion from a qualified, consulting physician. On the other hand, if the committee does agree to full disclosure, it should further inform both doctor and patient whether it intends to claim any protection from liability under the immunity statute. This procedure would minimize or avoid the kind of misunderstandings among the doctor, the patient and the committee that have spawned the appeal in the instant case.