# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40101

FARMERS NATIONAL BANK, )
)
   Plaintiff-Counterdefendant-Appellant, )
)
v. ) Twin Falls, November 2013 Term
)
GREEN RIVER DAIRY, LLC; ) 2014 Opinion No. 2
HERCULANO J. ALVES and FRANCES M. )
ALVES, husband and wife, dba GREEN ) Filed: January 24, 2014
RIVER DAIRY, )
) Stephen Kenyon, Clerk
   Defendants-Cross Defendants- )
   Respondents, )
)
and )
)
ERNEST DANIEL CARTER dba CARTER )
HAY AND LIVESTOCK; LEWIS BECKER; )
JACK MC CALL, )
)
   Defendants-Counterclaimants- )
   Cross Claimants-Respondents, )
)
and )
)
HULL FARMS, INC.; TIM THORNTON, )
)
   Defendants-Respondents. )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County.  Hon. G. Richard Bevan, District Judge.

The district court's declaratory judgment is vacated.

Coleman, Ritchie & Cluff, Twin Falls, for appellant.  John Stephen Ritchie argued.

Gery W. Edson, P.A., Boise, for respondent Hull Farms, Inc.  Gery Edson argued.

Wright Brothers Law Office, PLLC, Twin Falls, for respondents Ernest Daniel Carter and Jack McCall.  Andrew Benjamin Wright argued.

1

White Peterson Gigray Rossman Nye & Nichols, P.A., Nampa, for respondent Lewis Becker.

Hollifield Law Office, Twin Falls, for respondent Tim Thornton.

_____

HORTON, Justice.

This is an appeal from the district court's grant of declaratory judgment in favor of Green River Dairy, LLC, and four commodities dealers: Ernest Carter, Lewis Becker, Jack McCall, and Hull Farms (collectively "Sellers"). Appellant, Farmers National Bank (FNB), argues that the district court misinterpreted I.C. § 45-1802, a statutory lien provision, and, as a result, erred in granting Sellers a priority lien on collateral securing a loan previously made by FNB. We agree with FNB and vacate the district court's grant of declaratory judgment in favor of Sellers.

## I. FACTUAL AND PROCEDURAL BACKGROUND

FNB made ten loans to Green River in 2008 and 2009 to support Green River's dairy operations.[1] In connection with the loans, Green River granted FNB a security interest in its dairy cows. After executing a security agreement, FNB properly filed a UCC-1F, farm products financing statement, with the Idaho Secretary of State on May 12, 2008. All parties agree that FNB properly attached its interest in the collateral and properly perfected its interest through the filing of a financing statement.

Sellers sold commodities to Green River on credit, which included hay and/or wheat products, as feed for Green River's dairy cows. In conjunction with the sale of commodities to Green River, each seller filed lien notices with the Idaho Secretary of State pursuant to I.C. § 45-1804.

Green River defaulted on its loan repayment obligations to FNB. Accordingly, FNB took possession of Green River's dairy cows that secured FNB's loans. FNB sold the dairy cows at an auction held by Producers Livestock Marketing Association, the proceeds of which totaled $211,957.58. Despite FNB's perfected security interest in Green River's dairy cows, Sellers also

_____

[1] The loans made to Green River were personally backed by Herculano and Frances Alves. The Respondent's brief of Green River and the Alveses was due on December 24, 2012; however, it was never filed. Accordingly, the Court, on January 11, 2013, ordered that the appeal proceed solely on the briefing filed by Sellers.

claimed an interest in the dairy cows and the proceeds of the auction because the dairy cows had consumed liened agricultural products sold by Sellers to Green River.

FNB initiated this case on November 22, 2011, when it filed its Complaint for Declaratory Judgment. FNB asserted that Green River owed the bank $2,627,526.42. The amount claimed by FNB exceeded the total proceeds from the sale of the collateral. Further, FNB's complaint stated that pursuant to I.C. § 28-9-101, the bank had a senior perfected security interest in all dairy cows owned by Green River and the proceeds from the sale of those dairy cows. FNB's complaint asked the district court for: (1) a declaration of the respective priority rights of the parties in the proceeds of sale pursuant to I.C. § 28-9-101 and I.C. § 45-1801; (2) a declaration that FNB's UCC-1F interest in the collateral was properly perfected and a first priority encumbrance on Green River's dairy cows; and (3) a declaration that liens created pursuant to I.C. § 45-1802 in commodity sales do not extend to the dairy cows that consume the agricultural products subject to the lien. Each defendant named in FNB's complaint individually filed an answer.

On March 5, 2012, FNB filed a motion for summary judgment and a memorandum in support. On May 8, 2012, the district court issued its Memorandum Decision Re: Plaintiff's Motion for Summary Judgment. The district court framed the issue before it as "whether an agricultural commodity producer's lien created under I.C. § 45-1802 continues to exist upon the livestock that consume the agricultural product." Ultimately, the district court held that commodity liens created pursuant to I.C. § 45-1802 on agricultural products did extend to livestock that consumed the liened agricultural products. Accordingly, the district court denied FNB's motion for summary judgment and granted declaratory judgment in favor of Sellers. The district court issued its final judgment on May 30, 2012. FNB timely appealed.

## II. STANDARD OF REVIEW

When reviewing a grant of summary judgment, this Court employs the same standard as the district court. *Cnty. of Boise v. Idaho Cntys. Risk Mgmt. Program, Underwriters*, 151 Idaho 901, 904, 265 P.3d 514, 517 (2011). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). A "district court may grant summary judgment to a *non-moving party* even if the party has not filed its own motion with the court." *Aardema v. U.S. Dairy Sys.,*

3

*Inc.*, 147 Idaho 785, 793, 215 P.3d 505, 513 (2009) (quoting *Harwood v. Talbert*, 136 Idaho 672, 677, 39 P.3d 612, 617 (2001)). Additionally, "[t]his Court freely reviews the interpretation of a statute and its application to the facts." *St. Luke's Reg'l Med. Ctr., Ltd. v. Bd. of Comm'rs of Ada Cnty.*, 146 Idaho 753, 755, 203 P.3d 683, 685 (2009).

## III. ANALYSIS

### A. Statutory background for agricultural commodity dealer liens.

The primary issue presented in this appeal is whether an agricultural commodity lien that encumbers an agricultural product extends to livestock that consume the liened agricultural product. This hinges on the interpretation of I.C. § 45-1802, which provides:

> An agricultural commodity producer or an agricultural commodity dealer who sells, or delivers under contract or bailment, an agricultural product has a lien on the agricultural product or the proceeds of the sale of the agricultural product as provided in section 45-1804, Idaho Code. The lien created in this chapter may attach regardless of whether the purchaser uses the agricultural product purchased to increase the value of his livestock or whether he uses the agricultural product purchased to maintain the value, health or status of his livestock without actually increasing the value of his agricultural product.

The Legislature enacted what would become I.C. § 45-1802 in 1983; as originally enacted the statute consisted of only the first sentence. 1983 Idaho Sess. L. ch. 202, § 1, p. 550. However, in 1989 the Legislature amended I.C. § 45-1802 by adding the second sentence. 1989 Idaho Sess. L. ch. 299, § 1, p. 746–47.

"Agricultural product" is defined as:

[W]heat, corn, oats, barley, rye, lentils, soybeans, grain sorghum, dry beans and peas, beans, safflower, sunflower seeds, tame mustards, rapeseed, flaxseed, leguminous seed or other small seed, or any other agricultural commodity, including any of the foregoing, whether cleaned, processed, treated, reconditioned or whether mixed, rolled or combined in any fashion or by any means to create a product used as animal, poultry or fish feed.

I.C. § 45-1801(1). Notably, livestock are not included in the definition of "agricultural product."

### B. Statutory liens on agricultural products created under I.C. § 45-1802 do not continue in livestock that consume the liened agricultural products.

The district court concluded that I.C. § 45-1802 was unambiguous and provided that liens created by I.C. § 45-1802 continued in livestock that consumed liened agricultural products. The district court relied heavily on the term "uses" from the second sentence and referred to it as a "triggering verb" which, when read in context, created a lien in livestock that consume the liened agricultural product.

4

"The objective of statutory interpretation is to give effect to legislative intent." *State v. Yzaguirre*, 144 Idaho 471, 475, 163 P.3d 1183, 1187 (2007). "Such intent should be derived from a reading of the whole act at issue." *St. Luke's Reg'l Med. Ctr., Ltd.*, 146 Idaho at 755, 203 P.3d at 685. "Statutory interpretation begins with 'the literal words of the statute, and this language should be given its plain, obvious, and rational meaning.'" *Seward v. Pac. Hide & Fur Depot*, 138 Idaho 509, 511, 65 P.3d 531, 533 (2003) (quoting *Jen–Rath Co. v. Kit Mfg. Co.*, 137 Idaho 330, 335, 48 P.3d 659, 664 (2002)). "If the statutory language is unambiguous, 'the clearly expressed intent of the legislative body must be given effect, and there is no occasion for a court to consider rules of statutory construction.'" *St. Luke's Reg'l Med. Ctr., Ltd.*, 146 Idaho at 755, 203 P.3d at 685 (quoting *Payette River Prop. Owners Ass'n v. Bd. of Comm'rs of Valley Cnty.*, 132 Idaho 551, 557, 976 P.2d 477, 483 (1999)). This is because "[t]he asserted purpose for enacting the legislation cannot modify its plain meaning." *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 892–93, 265 P.3d 502, 505–06 (2011). A statute is ambiguous where:

> [T]he meaning is so doubtful or obscure that reasonable minds might be uncertain or disagree as to its meaning. However, ambiguity is not established merely because different possible interpretations are presented to a court. If this were the case then all statutes that are the subject of litigation could be considered ambiguous …. [A] statute is not ambiguous merely because an astute mind can devise more than one interpretation of it.

*BHA Investments, Inc. v. City of Boise*, 138 Idaho 356, 358, 63 P.3d 482, 484 (2003) (internal citations and quotations omitted).

On appeal, neither Sellers nor FNB argue that the second sentence of I.C. § 45-1802 is ambiguous. Rather, each party adheres to different interpretations of what the statute means. FNB argues that I.C. § 45-1802 does not extend an agricultural lien on an agricultural product to livestock that consume the liened agricultural product. Conversely, Sellers argue that the statute unambiguously extends an agricultural lien in an agricultural product to livestock that consume the liened agricultural product.

As we stated in *BHA Investments, Inc.*, the fact that two different interpretations of a statute are presented does not alone make a statute ambiguous. 138 Idaho at 358, 63 P.3d at 484. Rather, the statute's meaning must be so doubtful or obscure that reasonable minds would be uncertain or doubtful as to the statute's meaning. Such doubt and obscurity is not present in I.C. § 45-1802. Accordingly, we conclude that I.C. § 45-1802 is not ambiguous and use only the

5

plain language of Chapter 18, Title 45 in order to give effect to the legislative intent behind I.C. § 45-1802.[2]

The majority of the parties' textual arguments, as well as the district court's discussion below, focused on the second sentence of I.C. § 45-1802. Accordingly, little attention is paid to the first sentence of the statute in the parties' briefing. However, the first sentence is instrumental in interpreting the second sentence, and, Chapter 18, Title 45 as a whole, because it delineates the scope of what can be the subject of an agricultural lien. The import of the first sentence of I.C. § 45-1802 is clear, it states "[a]n agricultural commodity producer or an agricultural commodity dealer who sells, or delivers under contract or bailment, an agricultural product has a lien on the agricultural product or the proceeds of the sale of the agricultural product as provided in [I.C. §] 45-1804."

Based on the plain language, the first sentence creates a lien in favor of a commodity producer or dealer in an "agricultural product" and/or in the "proceeds of the sale of the agricultural product." As noted above, "agricultural product" is a defined term within Title 45. An agricultural product is:

> [W]heat, corn, oats, barley, rye, lentils, soybeans, grain sorghum, dry beans and peas, beans, safflower, sunflower seeds, tame mustards, rapeseed, flaxseed, leguminous seed or other small seed, or any other agricultural commodity, including any of the foregoing, whether cleaned, processed, treated, reconditioned or whether mixed, rolled or combined in any fashion or by any means to create a product used as animal, poultry or fish feed.

I.C. § 45-1801(1). Thus, the plain language of the first sentence of I.C. § 45-1802 allows a commodity producer or dealer to obtain a lien on any of the agricultural products listed in I.C. § 45-1801(1) or in the proceeds from the sale of any of the agricultural products listed in I.C. § 45-1801(1). Livestock, including dairy cows, are not an agricultural product that may be the subject of an agricultural lien. Accordingly, the plain language of the first sentence of I.C. § 45-1802 does not provide any basis for a commodity producer or dealer to maintain a lien right in livestock because the lien rights extend only to agricultural products and the proceeds of the sale of agricultural products.

---

[2] The United States Bankruptcy Court for the District of Idaho faced the precise issue before this Court in this case in *In Re Goedhart & Goedhart*, 03.3 ICBR 167 (2003). In that case, the bankruptcy court concluded that I.C. § 45-1802 was unambiguous and that the plain language of the statute did not extend agricultural liens to livestock that consumed liened agricultural products. *Id*. at 170.

Like the first sentence of I.C. § 45-1802, the second sentence is also clear and unambiguous on its face. It states that "[t]he lien created in this chapter may attach regardless of whether the purchaser uses the agricultural product purchased to increase the value of his livestock or whether he uses the agricultural product purchased to maintain the value, health or status of his livestock without actually increasing the value of his agricultural product." I.C. § 45-1802. The plain language of the second sentence in no way expands the scope of the agricultural lien created by the first sentence. Instead, the second sentence references "the lien created in this chapter," which is a lien on an "agricultural product or the proceeds of the sale of the agricultural product" and clarifies that the lien will attach regardless of whether the purchaser uses the agricultural product to increase the value of his livestock or simply maintain their value.

Because the lien created by I.C. § 45-1802 only extends to "agricultural products" and "the proceeds of the sale of the agricultural product," the district court erred in concluding that Sellers had an agricultural products lien on Green River's livestock because livestock are not agricultural products.

In addition to the plain language of I.C. § 45-1802 supporting FNB's interpretation, Chapter 45, Title 18, when read in its entirety, indicates that the agricultural lien created in I.C. § 45-1802 does not extend to livestock that consume liened agricultural products. We consider these additional provisions that comprise Chapter 45, Title 18, because legislative "intent should be derived from a reading of the whole act at issue." *St. Luke's Reg'l Med. Ctr., Ltd.*, 146 Idaho at 755, 203 P.3d at 685. Specifically, I.C. §§ 45-1803 and 1805 support FNB's interpretation that the lien created by I.C. § 45-1802 does not extend to livestock.

Idaho Code § 45-1803 states that "[t]he lien created by section 45-1802, Idaho Code, attaches to the agricultural product and to the proceeds of the subsequent sale of the agricultural product on the date the agricultural product is physically delivered to the purchaser or on the date any final payment is due, and unpaid." This provision reinforces FNB's interpretation by reiterating what products or proceeds a commodity lien may attach to. The terms of I.C. § 45-1803 only allow for the attachment of a lien to an "agricultural product" or the "proceeds of the subsequent sale of the agricultural product," not livestock. Thus, I.C. § 45-1803 echoes I.C. § 45-1802 and provides that an agriculture commodity lien can only attach to agricultural products or the proceeds of the sale of those products.

Next, I.C. § 45-1805 states:

The lien created by section 45-1802, Idaho Code, is preferred to a lien or security interest in favor of a creditor of the purchaser, regardless of whether the creditor's lien or security interest attaches to the agricultural product or proceeds of the sale of the agricultural product before or after the date on which the lien created by section 45-1802, Idaho Code, attaches.

Like I.C. § 45-1803, I.C. § 45-1805 also reinforces FNB's interpretation of I.C. § 45-1802. Idaho Code § 45-1805 supports FNB's interpretation because it only gives agricultural liens priority over prior liens or security interests where the prior lien or security interest was in an "agricultural product" or "proceeds of the sale of the agricultural product," not livestock. Thus, I.C. § 45-1805 supports our conclusion that I.C. § 45-1802 does not create a lien on livestock, only in "agricultural products" and the "proceeds of the sale of the agricultural product."[3]

The statutory framework of Chapter 45, Title 18, as a whole, reflects clear legislative intent that agricultural commodity liens only extend to "agricultural products" and to the "proceeds of the sale of agricultural products." Had the Legislature wished to include livestock in the definition of "agricultural product" it easily could have. However, it did not. Based on the plain language of I.C. § 45-1802, and Chapter 45, Title 18 as a whole, we hold that the district court erred in concluding that Sellers had a lien on Green River's dairy cows that was senior to FNB's security interest.

Because I.C. § 45-1802 is not ambiguous, this Court has not and will not resort to methods of statutory construction in order to derive the legislative intent behind the statute. Accordingly, the parties' arguments relating to various canons of construction and legislative history are irrelevant to this Court's determination in this case.

## C. Attorney fees.

Sellers separately request attorney fees under the following statutory theories. Thornton, without any argument, requests attorney fees pursuant to I.C. §§ 45-1809 and 12-120(3). Carter and McCall request attorney fees pursuant to I.C. §§ 45-1809 and 12-120(3). Becker requests attorney fees pursuant to I.C. § 45-1809. Hull Farms requests attorney fees pursuant to I.C. §§ 45-1809 and 12-120(3). Also, FNB requests attorney fees pursuant to I.C. § 45-1809.

---

[3] In addition, the plain language of I.C. § 45-1805 reveals a serious flaw in the district court's analysis of the parties' competing priority rights. Even if the second sentence of I.C. § 45-1802 were somehow construed to extend lien rights to livestock that consume liened agricultural products, such a lien would not have priority over a prior perfected security interest in the livestock because the plain language of I.C. § 45-1805 only gives priority to commodity liens in agricultural products or their proceeds, not livestock.

8

Attorney fees pursuant I.C. § 12-120(3) are not awardable in this case because there was no commercial transaction between the parties. *See Carrillo v. Boise Tire Co., Inc.*, 152 Idaho 741, 756, 274 P.3d 1256, 1271 (2012). Rather, they simply have made claims to identical collateral. Accordingly, all requests for attorney fees pursuant to I.C. § 12-120(3) are without merit. No party is entitled to attorney fees under I.C. § 45-1809. FNB is not entitled to an award of attorney fees under I.C. § 45-1809 because it has not claimed an agricultural commodity lien. Sellers are not entitled to an award of attorney fees under I.C. § 45-1809 because they have not prevailed.

## IV. CONCLUSION

We vacate the district court's declaratory judgment in favor of Sellers and find that between FNB and Sellers, FNB's security interest in Green River's dairy cows is superior to that of Sellers. No attorney fees are awarded on appeal. Costs on appeal to FNB.

Justice EISMANN and Justices Pro Tem KIDWELL and SCHROEDER, **CONCUR**.

J. JONES, Justice, dissenting.

I dissent from the Court's opinion because, although the Court has articulated a sound technical basis for its conclusion, I believe the legislative history of I.C. § 45-1802 dictates a different outcome. Perhaps my view of the Legislature's action is somewhat influenced by having grown up in the cattle-feeding business. From that vantage point, the arguments advanced by the Respondents with respect to the legislative process are understandable, as they apparently were for the district judge, who presides in farm country. I would affirm his decision, which continued the Respondents' feed liens into the cattle that consumed the liened feed.

It must be acknowledged that the language employed in I.C. § 45-1802 is not ideal from the standpoint of either side. It obviously would have been better from the standpoint of the Respondents had the Legislature specifically stated that the feed liens continued into the animals that consumed the feed. Based on the legislative history, it clearly appears that this was the understanding and intent of the proponents of the legislation. Viewed from the standpoint of the Appellant, it is hard to determine what the second sentence would mean absent an intention to preserve the secured status of the feed producer or dealer. Although both sides contend in the first instance that the statute is unambiguous, it is practically impossible to read it in that fashion.

In *Pioneer Irrigation Dist. v. City of Caldwell*, 153 Idaho 593, 597, 288 P.3d 810, 814 (2012), this Court stated:

> If a statute is ambiguous because more than one reasonable interpretation exists, we look to rules of statutory construction for guidance. *Payette River Prop. Owners Ass'n v. Bd. of Comm'rs of Valley Cnty.*, 132 Idaho 551, 557, 976 P.2d 477, 483 (1999). In the event that this Court is required to engage in statutory construction, we may ascertain legislative intent from the statute's context, the public policy in support of the statute, and the statute's legislative history. *State v. Rhode*, 133 Idaho 459, 462, 988 P.2d 685, 688 (1999).

Our goal in interpreting a statute is "to give effect to the purpose of the statute and the legislative intent in enacting it, which may be implied from the language used or inferred on grounds of policy or reasonableness." *The Senator, Inc. v. Ada Cnty. Bd. of Equalization*, 138 Idaho 566, 570, 67 P.3d 45, 49 (2003).

> Each word used in a statute is important and must be considered:

> It is well established that we are required to give effect to every word, clause and sentence of a statute . . . and the construction of a statute should be adopted which does not deprive provisions of the statute of their meaning.

*George W. Watkins Family v. Messenger*, 118 Idaho 537, 540, 797 P.2d 1385, 1388 (1990). Furthermore:

> [T]his Court "will not construe a statute in a way which makes mere surplusage of provisions included therein." *Bradbury v. Idaho Judicial Council*, 149 Idaho 107, 116, 233 P.2d 38, 47 (2009) (quoting *Sweitzer v. Dean*, 118 Idaho 568, 571−72, 798 P.2d 27, 30−31 (1990)); *See also Twin Lakes Canal Co. v. Choules*, 151 Idaho 214, 218, 254 P.3d 1210, 1214 (2011) (holding that courts may not interpret a statute in a manner that would "render it a nullity").

*Roesch v. Klemann*, 155 Idaho 175, 177−78, 307 P.3d 192, 194−95 (2013). "It is assumed that when the legislature enacts or amends a statute it has full knowledge of the existing judicial decisions and case law of the state." *Watkins*, 118 Idaho at 540, 797 P.2d at 1388. As with other types of statutory liens, the Court should liberally construe I.C. § 45-1802 so as to effect its objects and promote justice. *See Metropolitan Life Ins. Co. v. First Sec. Bank of Idaho*, 94 Idaho 489, 493, 491 P.2d 1261, 1265 (1971).

A review of the Legislature's action in amending I.C. § 45-1802 in 1989 is instructive. The sponsor of the legislation, former Representative Bruce Newcomb, proposed in RS 22816 to add a second sentence to the one-sentence statute. The RS read:

> 45-1802. LIEN CREATED – WHO MAY HAVE. An agricultural commodity producer or an agricultural commodity dealer who sells an agricultural product has a lien on the agricultural product or the proceeds of the sale of the agricultural product until payment is made in full. <u>The lien created in this chapter may attach regardless of whether the purchaser uses the agricultural product purchased to</u>

10

> increase the value of his agricultural product or whether he uses the agricultural product purchased to maintain the value, health or status of his agricultural product without actually increasing the value of his agricultural product.

Thus, Rep. Newcomb proposed to add the underlined language to the existing statute. He described his intention in the Statement of Purpose[4]: "This Legislation defines feed and lien so that *when a feed lien is filed on domestic livestock* the lien would be valid even though the feed just maintained the livestock rather than added value." (emphasis added). Thus, we know the purpose of the statute and may consider it in attempting to determine the intent of the Legislature. *The Senator*, 138 Idaho at 570, 67 P.3d at 49.

The legislation was designated H.B. 314 and, when it was considered in the House Agricultural Affairs Committee, the bill sponsor's presentation was recorded as follows:

> Rep. Newcomb said that in the past it has been understood in the feed industry that when feed was sold to consumer, that the feed lien would attach to the animal which was being fed—it had to add value. This legislation says that even if it does not add value, it is still valid. In other words, if it just maintained the livestock rather than adding value, a lien filed on the livestock would be a valid lien.

An attorney representing the Idaho Bankers Association spoke in opposition:

> Pat Collins, Idaho Bankers Association, spoke in opposition to this legislation. He feels it is poor language and the definitions bad. He stated that the language will not do what it says it will do. He said the definitions stretch the meanings to include a lot of products. He feels the term "agricultural product" is a bad term.

The bill was reported to the House floor and approved.

The legislation encountered some difficulty when considered by the Senate Agricultural Affairs Committee. The minutes reflect the following:

> Rep. Newcomb spoke to the legislation which amends the lien chapter of the Idaho code to provide that a lien has validity or may attach even if the feed fed to an animal does not add value to the animal but just maintains it. Rep. Newcomb referred to a court case that had refuted this concept.

---

[4] Although the statement of purpose that accompanies a piece of legislation may not always be the best source for determining legislative intent, this Court has often looked to the statement of purpose for guidance. In *KGF Development, LLC v. City of Ketchum*, 149 Idaho 524, 236 P.3d 1284 (2010), we looked to the statement of purpose accompanying a bill to determine the Legislature's intent behind a statute, as well as a city's statement of purpose for an ordinance to determine the intent behind the ordinance. *Id.* at 528−29, 236 P.3d at 1288−89. Likewise, in *Stuart v. State*, 149 Idaho 35, 44, 46, 232 P.3d 813, 822, 824 (2010), we placed reliance on a legislative statement of purpose in determining legislative intent. Here, the Statement of Purpose is consistent with statements made before legislative committees by the bill's sponsor, a respected member of the Legislature. While opposition statements focus on the efficacy of the language in the bill to accomplish the stated intent, there is no dispute as to the intended purpose of the bill.

11

Senator Smyser pointed out the difficulty of understanding either the intent or the language contained in the bill, and suggested that clarification of the words "agricultural product" was needed on line 15 and line 17.

Berne Jensen, Idaho Bankers Association, stated that his organization could neither support nor oppose the legislation since they were unable to understand what the intent of the bill is. He suggested the bill needs redrafting for clarification.

Pat Collins, attorney for the Idaho Bankers Association, informed the committee members that the drafter of the bill was faced with two problems (1) the language of the existing chapter, and (2) the court case referred to by Rep. Newcomb. The court assumed that the lien on the feed continued into the cattle; in order to avoid that result the court ruled it didn't increase the value of the cattle; therefore, there is no lien in the cattle. Mr. Collins stated that he does not believe that the lien continues in the cattle that eats the feed; the language that has been added assumes that this lien does continue. It is his opinion that the bill is responding to an ill-advised court decision and does not accomplish what he thinks the sponsor seeks to accomplish.

The bill was reported to the Senate floor for amendment. The amendment, following the suggestion of Senator Smyser, read:

### SENATE AMENDMENTS TO H.B. NO. 314

### AMENDMENTS TO SECTION 1

On page 1, line 15, of the printed bill, delete: "agricultural product" and insert: "livestock"; and in line 17, delete "agricultural product" and insert: "livestock".

### CORRECTIONS TO TITLE

On page 1, line 5 of the printed bill, delete "AGRICULTURAL PRODUCT" and insert: "LIVESTOCK"; and in line 6, delete "AGRICULTURAL PRODUCT" and insert: "LIVESTOCK".

With that amendment, H.B. 314 passed the Senate and was enacted into law. The title and text of the legislation are as follows:

### AN ACT
RELATING TO AGRICULTURAL COMMODITY DEALER OR PRODUCER LIENS; AMENDING SECTION 45-1802, IDAHO CODE, TO PROVIDE THAT A LIEN MAY ATTACH WHETHER THE PURCHASER OF THE AGRICULTURAL PRODUCT USES IT TO INCREASE THE VALUE OF HIS LIVESTOCK OR WHETHER HE USES IT TO MAINTAIN THE CURRENT STATUS, HEALTH, OR VALUE OF HIS LIVESTOCK.

Be It Enacted by the Legislature of the State of Idaho:

SECTION 1. That Section 45-1802, Idaho Code, be, and the same is hereby amended to read as follows:

> 45-1802. LIEN CREATED—WHO MAY HAVE. An agricultural commodity producer or an agricultural commodity dealer who sells an agricultural product has a lien on the agricultural product or the proceeds of the sale of the agricultural product until payment is made in full. The lien created in this chapter may attach regardless of whether the purchaser uses the agricultural product purchased to increase the value of his livestock or whether he uses the agricultural product purchased to maintain the value, health or status of his livestock without actually increasing the value of his agricultural product.

1989 Idaho Sess. Laws, ch. 299, § 1, pp. 46−47.

As *Pioneer Irrigation* instructs, we may ascertain legislative intent from a statute's context. 153 Idaho at 597, 288 P.3d at 814. In his testimony to legislators, Rep. Newcomb stated the understanding in the feed industry to be that "the feed lien would attach to the animal which was being fed." Both Rep. Newcomb and the Idaho Bankers Association attorney, Pat Collins, referenced a court decision that "assumed that the lien on the feed continued into the cattle," but only when the feed increased the value of the cattle. Absent an increase in the value of the cattle, the feed lien did not continue. Unfortunately, neither party identified the court decision.

In any event, the stated purpose of the legislation was to amend I.C. § 45-1802 "so that when a feed lien is filed on domestic livestock, the lien would be valid even though the feed just maintained the livestock rather than added value." Having been raised in the livestock industry, it is not difficult to understand the context of this legislation. Those in the industry obviously understood that a feed lien is of little value if it is extinguished at the moment the feed is ingested by the animal. Those in the industry appear to have understood that the feed was ingested by the animal, incorporated into the animal's body, and added value over and above the price of the animal. While feed does not obviously convert to fat, muscle and bone on a one-to-one ratio, some of the feed undeniably converts to bodily substance and enhances the value of the livestock. Of interest is the fact that at the same time H.B. 314 was making its way through the legislative process, I.C. § 45-1801(1) was in the process of being amended by H.B. 191 to specifically include "a product used as animal . . . feed" within the definition of "agricultural product." 1989 Idaho Sess. Laws, ch. 265, § 1, pp. 644−45. H.B. 191 received final legislative approval on April 3, 1989, and H.B. No. 314 received final legislative approval the following day.

The agricultural industry was not alone in holding the understanding that a feed lien continued into the livestock that consumed the feed. As the Honorable Jim D. Pappas, the District of Idaho's Chief U.S. Bankruptcy Judge, observed in a case cited by both parties:

13

> Evans Grain [a commodity dealer] also argues that deference should be given to the Idaho Secretary of State's interpretation of Idaho Code § 45-1802. The Secretary of State published the form to be used by agricultural commodity dealers and producers to assert and perfect a lien. That form allows the lien claimant to designate both livestock and milk among the kinds of property in which the lien is asserted.[5]

*In Re Goedhart & Goedhart*, 03.3 IBCR 167, 171 (Bankr. D. Idaho 2003). While Judge Pappas declined to give any legal weight to the Secretary of State's interpretation of I.C. § 45-1802, the obvious belief of Idaho's grand old stockman and most prominent sheepherder—that a feed lien continued into the animal to which it was fed—demonstrates the truth and reliability of the industry understanding stated by Rep. Newcomb, as well as the ambiguous nature of the statute.

When H.B. 314 was considered in the Senate Committee, Senator Smyser pointed out the difficulty of understanding the intent of the new second sentence based on the "agricultural product" language. The Idaho Bankers Association witnesses agreed. H.B. 314 was then amended to substitute "livestock" for "agricultural product" in two places. The legislation then provided that a lien "may attach" regardless of whether the buyer of the feed "uses" it to increase the value of his livestock or whether he "uses" it to maintain the value, health or status of his livestock. In the cattle context, this would cover both feeder cattle, the weight and value of which are increased by consumption of the feed, and dairy cattle, whose value, health and status are maintained by eating the feed. The language used in the second sentence of H.B. 314, as amended, is certainly not ideal to accomplish the stated purpose but it is adequate. The statute says that a lien may "attach" if the feed buyer "uses" the product to increase the value of his livestock or to maintain their value. It does not say "if the feed is intended to be used" for either purpose, indicating a forward-looking usage. Rather, it employs the present tense. Similarly, the contemporaneously amended definition of "agricultural product" specifically included a product "used" as animal feed. Again, not "to be used" but, the past tense "used." The statutory title of

---

[5] Judge Pappas was likely referring to the Secretary of State's then-current Form C-1, a copy of which was placed in the record by Appellant. A July 2001 version of that form, designed to provide notice of agricultural product liens pursuant to I.C. § 45-1802, includes a wide variety of animals covered as "proceeds" under an agricultural commodity lien. Appellant notes that the Form C-1 was revised in March of 2004 to delete the proceeds listings. It is likely that the Secretary of State devised the July 2001 version of the form in response to I.C. § 45-1808, which was amended in the Legislature's 2000 session to require the Secretary of State to prescribe the form for filing of an agricultural commodity lien. 2000 Idaho Sess. Laws, ch. 339, § 4, p. 1134. Previously, such liens had been filed with the county recorder. There is no evidence in the record to indicate what information was required in filings with the county recorder prior to 2001. Nor does the record show what prompted the Secretary of State to adopt the March 2004 version of Form C-1. It might be observed, however, that the *Goedhart* decision came out in 2003 and the Form C-1 was amended shortly thereafter.

the enacted bill continues this theme, indicating that I.C. § 45-1802 was designed "to provide that a lien may attach whether the purchaser of the agricultural product uses it to increase the value of his livestock or whether he uses it to maintain the current status, health, or value of his livestock."

It is difficult to determine what the purpose of the second sentence of I.C. § 45-1802 would be, if not to continue the lien into the consuming livestock, as the district court determined. No convincing argument has been made that it clarifies anything or otherwise has any meaningful purpose, if not read as Respondents contend. The Appellant's position would render the second sentence of I.C. § 45-1802 essentially meaningless—a nullity—contrary to the statutory construction principles articulated in *Roesch*. *Id.* at 177−78, 107 P.3d at 194−95. As the district court points out, the Appellant's interpretation of the second sentence of the statute "adds nothing, and clarifies nothing," and is "the very definition of being superfluous."

On the other hand, the district court did find the Respondent's interpretation of the second sentence to be convincing:

> The most convincing factor to this court is how the second sentence implements the word, "uses." As identified above, "uses" is the triggering verb in the second sentence; however, once the agricultural product is "used" to increase or maintain the value of livestock, the agricultural product is no longer in a state of livestock feed—it has been ingested and is not distinguishable from the livestock that ingested it. The second sentence indicates that the agricultural lien attaches even when this triggering event occurs. To the court, this means that the agricultural lien attaches to the feed, and continues if commingled with livestock through the livestock's use—or consumption—regardless of whether the agricultural product increased the livestock's value, or maintained its value.

As noted above, the definition of agricultural product was contemporaneously amended in 1989 to specifically include "a product used as animal . . . feed." The second sentence of I.C. § 45-1802 was intended to expand the lien provided in the first sentence to attach to animals that used the feed.

The same conclusion was reached in another district court decision placed in the record by counsel for one of the Respondents. A Bingham County decision, also from farm country, written by the Honorable Jon Shindurling, is well reasoned and therefore worthy of quoting:

> The ambiguous second sentence of § 45-1802 provides for attachment in the lien even if the agricultural product is "used", which in the case of livestock feed would mean it attaches even if the feed is "eaten". I.C. § 45-1803 provides that the "lien created by § 45-1802, Idaho Code, attaches to the agricultural product . . . on the date the agricultural product is physically delivered to the purchaser **or**

15

**on the date any final payment is due, and unpaid . . . whichever occurs last."** (Emphasis added.) If the lien were to attach when the final payment is due and unpaid, then to be consistent with I.C. § 45-1802 which allows the lien to attach regardless of whether the product is "eaten," there exists a very likely possibility that a portion if not all of the feed would already have been consumed by the livestock when the lien attaches.

Common sense dictates that the legislature would not extend a lien in feed if the lien rights would literally disappear into the belly of the cow before they could attach to the feed. This would be a ridiculous result and such a construction would strip the sentence of any meaning whatsoever. In interpreting a statute, the Court is to "seek a sensible construction that will avoid an absurd result." *Gavica v. Hanson*, 101 Idaho 58, 60, 608 P.2d 861, 863 (1980) (overruled on other grounds by *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986)).[6]

*Stander Farms, Inc. v. Todd Feld*, Bingham County District Court Case No. CV-02-1506 (December 31, 2002).

Judge Shindurling goes on to make another good point:

This conclusion is strengthened by analogy to another statutorily created agricultural lien. Idaho's "agister lien" statute provides that "persons pasturing livestock of any kind, have a lien . . . for their compensation in . . . feeding [or pasturing] such livestock. If the liens as herein provided are not paid . . . the person in whose favor such special lien is created may proceed to sell the property at a licensed public livestock auction market. . ." I.C. § 45-805(b).

The district judge supports this parallel comparison by citation to *Killeen v. Vernon*, 121 Idaho 94, 97, 822 P.2d 991, 994 (1991) where we said, "when a statute contains ambiguous language, we look to the other statutes in the title or act relating to the same subject matter and read them *in para materia* in an effort to determine what the legislature intended." Both I.C. §§ 45-805 and 45-1802 are contained within the same title of the Idaho Code and both deal with statutory liens. An agister, who obtains a lien by feeding livestock does not have a lien in the feed but, rather, in the livestock that consumes/uses the feed.[7] It is reasonable to conclude that the Legislature intended a similar result with I.C. § 45-1802.

The Legislature obviously intended that a producer or dealer who sold feed to a stockman would retain a lien even if the stockman were to sell the feed to another party. Idaho Code § 45-

---

[6] The *Gavica* quote reads in full: "In effectuating the legislative intent behind an ambiguous statute, the Court should, if possible, avoid indulging in a statutory construction which would cause absurd or unduly harsh results." *Gavica*, 101 Idaho at 60, 608 P.2d at 863. This principle of statutory construction was reiterated in *Pfau v. Comair Holdings, Inc.*, 135 Idaho 152, 157, 15 P.3d 1160, 1165 (2000).

[7] Similarly, a materialman does not lose his lien under I.C. § 45-501, another Title 45 statutory lien, simply because some of his materials are incorporated into a house or other building. The materialman's lien attaches to the building upon incorporation of the liened material.

16

1802 specifically grants a lien in and to the proceeds. Counsel for Respondent Hull Farms vigorously asserted this means the lien follows the feed into the animal and the animal is the "proceeds" to which the lien attaches. However, little explanation of this contention was provided either in briefing or oral argument. In his decision in the *Stander Farms* case, Judge Shindurling performed a rather more convincing analysis of the proceeds theory. He first noted that I.C. § 28-9-109 provides for application of Article 9 of the UCC to agricultural liens. I.C. § 28-9-109(a)(2). He indicates that an I.C. § 45-1802 lien fits the definition of "agricultural lien" in I.C. § 28-9-102—an interest in "farm products," which term is defined as "livestock, born or unborn," or "products of crops or livestock in their unmanufactured states." I.C. § 28-9-102(a)(34)(B) and (D). Judge Shindurling then concludes that under these provisions "an agricultural lien is a type of security interest created by statute (I.C. § 45-1802 in this case) in favor of the feed supplier and can be an interest in the debtor's livestock and milk (as a livestock product in an un-manufactured state.)"

At the time, Judge Shindurling did not have the benefit of our decision in *Karle v. Visser*, 141 Idaho 804, 118 P.3d 136 (2005), in which the Court gave a broad reading to the UCC definition of "proceeds" in I.C. § 28-9-102(a)(64). We noted this to be "an expanded definition of proceeds" and held that proceeds of a security interest in a promissory note included the right to collect on the note and to file a suit for collection. 141 Idaho at 806, 808, 118 P.3d at 139, 141. When Judge Shindurling's analysis is considered in light of the rather expansive holding in *Karle*, it is somewhat more convincing—if the proceeds of a promissory note extend to the right of collecting and suing on the note, it is not such a stretch to characterize the livestock that consume feed to be the proceeds of a feed lien.

Whether one accepts the theory that the livestock should be considered the proceeds of the feed, or the theory that the lien continues in and attaches to the animal that consumes the feed, an early decision of this Court, *Hoebel v. Raymond*, 46 Idaho 55, 266 P. 433 (1928), tips the balance in favor of the Respondents. This pre-UCC case involved a promissory note given by the lessee of farm land to his attorney, secured by a chattel mortgage on a crop of hay growing on the leased property. 46 Idaho at 58, 266 P. at 434. Thereafter, a court-appointed receiver took over the possession and management of the leased property, including almost 400 tons of hay that was subject to the attorney's mortgage. *Id.* The attorney notified the receiver that he would not be permitted to feed the hay to livestock in his possession without providing an accounting to

17

the attorney. *Id.* The receiver promised to account for the hay, which thereafter was consumed by the livestock. *Id.* at 59, 266 P. at 434. The receiver contended that the attorney had waived his mortgage security by allowing the hay to be fed to the livestock and that the attorney was not entitled to payment from funds held by the receiver. The funds had been realized from sale of the cattle that consumed the hay. *Id.* The district court held that the attorney had a preferred lien in the funds held by the receiver, after deducting certain amounts for labor liens outstanding against the hay crop. *Id.* The Supreme Court affirmed the judgment. According to the Court:

> It was shown and found that the hay was honestly fed, that the [debtor's] live stock were preserved and improved thereby, and that the fund [realized from the livestock] was the direct result of such improvement. That property was in all conscience answerable for the debt and impressed with a lien or trust running to the mortgagee. . . . In the instant case, the proceeds of the hay were by the receiver converted into beef and horseflesh, and were . . . subject to the trust undertaken. *Id.* at 61−62, 266 P. 435.

Thus, the attorney's lien against the hay continued into the livestock that consumed the hay and, further, into the proceeds of the sale of the livestock. The same result should obtain here, regardless of whether one adopts the proceeds theory asserted by Hull Farms or the theory that the feed lien continued into the livestock that consumed the feed.

Further, the fact that the lien continues into the proceeds upon sale of the feed would support the conclusion that the Legislature intended that the feed, when consumed by the animal and some of it incorporated into the bodily structure, was still subject to the lien. What possible reason could the Legislature have had for continuing the lien if the feed is sold, but terminating it if the feed is consumed? Use/consumption of feed is its intended purpose, not resale. It obviously assumed that the lien would continue into the animal that ate the feed. Otherwise, an exceedingly harsh result would obtain, contrary to the principle that "[a] construction [of an ambiguous statute] that leads to an absurd or unreasonably harsh result is disfavored." *State v. Hickman*, 146 Idaho 178, 184, 191 P.3d 1098, 1104 (2008).

The Legislature clearly intended to protect agricultural commodity producers and dealers by providing them a lien that would take priority over security interests of lenders, even where the agricultural product was sold by their buyer. It is absurd to think that the Legislature would place in the hands of the buyer the ability to unilaterally terminate the lien rights of the producer or dealer simply by feeding his livestock. I am aware of no other lien or security interest available under the laws of the State of Idaho that can be unilaterally terminated at the sole

18

instance of the debtor. That simply does not make sense. To adopt the Appellant's interpretation of the statute, the Legislature engaged in a somewhat meaningless act by enacting chapter 18 of Title 45 in the first place, except in the instance where the commodity buyer either kept or sold the commodity, and the passage of H.B. No. 314 was merely an exercise in futility.

I read this situation otherwise. Rep. Newcomb introduced his legislation to remedy a concern raised by a court decision. As he stated, it had been understood in the industry that a feed lien continued into the animal that consumed the feed. This understanding may well have been aided by the *Hoebel* decision, which the Legislature is presumed to have known about when I.C. § 45-1802 was initially enacted in 1983. 1983 Idaho Session Laws, ch. 202, § 1, p. 549. A judge had apparently held that the lien did not continue into the animal unless the value of the animal was enhanced. Rep. Newcomb's legislation was designed to allow the lien to attach regardless of whether the feed enhanced the value of the animal or simply maintained its health and value. Based upon his representations, the Legislature had a choice. It could enact the legislation to accomplish the purpose represented by Rep. Newcomb or, having learned what the understanding in the industry was, could have gone the other way and adopted legislation to the contrary. The Legislature approved the legislation. The Legislature has amended I.C. § 45-1802 two times—once in 2000 (2000 Idaho Sess. Laws, ch. 339, § 1, p. 1133) and once in 2001 (2001 Idaho Sess. Laws, ch. 363, § 2, pp. 1279−80), both for technical purposes—but on neither occasion did the Legislature take the opportunity to change the understanding expressed in 1989 by Rep. Newcomb. Otherwise, we don't know how the statute has been applied because, unfortunately, none of the parties placed evidence in the record in that regard.

We do know that the Secretary of State adopted a form in 2001 that confirmed the understanding of the legislation's proponent and that the two district court decisions brought to the attention of this Court—one by Judge Shindurling in 2002 and the present one by Judge Bevan in 2012—ruled in the same fashion. As Respondents point out, the only plausible interpretation of the amendment accomplished by H.B. 314 is that it addresses the issue of whether a feed lien needed to increase the value of livestock in order to attach to the livestock. They argue that this is based upon "the predicate fact that the feed lien does in fact attach to the livestock. If it did not attach to the livestock, why would it matter if the livestock added, maintained, or lost weight?" It should be kept in mind that H.B. 191 was in the legislative process at the very time H.B. 314 was under consideration. H.B. 191, which had an emergency

clause, was approved by the Legislature on April 3, 1989, and went into effect before H.B. 314. It amended the definition of "agricultural product" to specifically include commodities that were "mixed, rolled or combined in any fashion or by any means to create a product used as animal, poultry or fish feed." Combining in any fashion can be reasonably interpreted to mean combining in the bodily structure of an animal to which the feed was fed. This conclusion is supported by the fact that the Legislature defined feed as a product "used," not "to be used." Feed is used when it is fed to an animal, not before. Then, H.B. 314 utilizes this revised definition of agricultural product to state that the lien attaches regardless of how the purchaser "uses" the product. Again, the tense of the word is important. When one considers the words used in the context of the legislation, the problem it was intended to remedy, the stated purpose, and the industry understanding, it is not difficult to read the legislative intent to be as stated by Rep. Newcomb and as contended by Respondents.

*Pioneer Irrigation* also instructs that legislative intent may be derived from the public policy in support of the statute. 153 Idaho at 597, 288 P.3d at 814. As Respondents point out:

> If a dairy farm or other livestock operation cannot obtain adequate feed, its livestock will not produce livestock products or offspring and will not maintain their value. The agricultural commodities producers and dealers "[add] directly to the value of the property of another" by providing the materials livestock owners need to "maintain" or "increase" the value of their livestock. This also explains why the legislature would provide for the statutory lien to take priority over a competing security interest in I.C. § 45-1805. If the lien did not take priority over a competing security interest, it would be of little value because in the event of a default the seller of livestock feed could never get paid unless the bank's loan was paid in full. Granting higher priority to the lien provides an incentive for suppliers to provide the inputs necessary for the livestock operation to stay in business. It is reasonable to infer that the legislature intended to protect the interests of farmers who provide feed to owners of livestock, and that its 1989 amendment was intended to ensure that the lien would attach to the livestock or to livestock products regardless of how the feed was used.

In other words, the feed provided by farmers or commodity dealers keeps the animals alive and enhances their value to the benefit of both the owner and the secured lender. It is interesting to note that the amount Appellant received from the sale of some of the livestock ($211,957.58) was slightly more than the Respondents furnished in feed ($185,404.71). Had the Respondents not furnished the feed, the livestock may not have survived to sale time.

Having grown up in the cattle-feeding business, Respondents' argument certainly rings true. My father, Henry Jones, purchased animal feed—wheat, barley, and corn (for silage)—from

20

hundreds of feed producers. The feed enhanced the value of the cattle well above any monies that lending institutions may have advanced to purchase them. An interpretation of I.C. § 45-1802 that disregards the value of the enhancement of livestock, or even the maintenance of their value, shortchanges these feed producers. The Appellant argues, however, that lending to the livestock industry will be plagued by uncertainty and instability if some protection is afforded to feed producers. However, as Respondents point out, "lending institutions are in a much stronger position to protect themselves than feed suppliers, who more often than not, simply run small farm operations whose continued existence depends on payment for that year's crops." They note that "[a] lender can obtain financial information from the borrower <u>prior</u> to making a loan and confirm that the money it lends for feed is actually spent on feed." With a prior perfected security interest in the livestock, the lender is entitled to have its name placed on any payment check for feed and therefore has some leverage vis-à-vis the feed supplier. And, since the livestock industry has apparently been operating in accord with the district court's holding, it is not likely that great instability and uncertainty will be injected into the system if the practice continues.

For the foregoing reasons, I would affirm the district court. However, it would certainly be incumbent upon the interested parties to bring this matter back to the Legislature so as to obtain absolute certainty as to the status of lenders and feed producers on this issue.